593 A.2d 402

In re: INVESTIGATING GRAND JURY OF PHILADELPHIA COUNTY NO. 88–00–3503, Search Warrant No. 63302.

Petition of: Richard E. MILLER, Esquire, X Company, and Employee A.

In re: INVESTIGATING GRAND JURY OF PHILADELPHIA COUNTY NO. 88–00–3505.

Petition of: Paul R. ROSEN, Esquire, Richard E. Miller, Esquire and Employee B.

Supreme Court of Pennsylvania.

Argued April 6, 1990.

Decided June 25, 1991.

434

Paul R. Rosen, Richard E. Miller, for petitioner.

Janet Houser, Asst. Dist. Atty., George S. Leone, Asst. Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., for respondent.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

ZAPPALA, Justice.

This is a direct appeal from three orders entered by the Philadelphia County Court of Common Pleas in conjunction with the supervision, administration, and operation of Investigating Grand Jury No. 88-00-3505. The grand jury investigation involved allegations of improper diversion of public

funds by officials in the Office of the Clerk of Quarter Sessions and the Sheriff's Department of Philadelphia County through the investment of the funds in certificates of deposit referred to as charitable certificates of deposit ("CDs"). The charitable CDs paid a lower rate of return than other CDs available at the Philadelphia financial institution, with a percentage of the interest on the investment being contributed to a private organization qualifying for a charitable tax deduction.

The record has been sealed in this matter to preserve the confidentiality of the grand jury's inquiry. For that reason, the individuals and financial institution involved in the inquiry will not be identified by name. The Petitioners include the Philadelphia bank that issued the CDs, the president of the bank, an employee of the bank ("Employee B" herein), and their counsel Paul R. Rosen, Esquire and Richard E. Miller, Esquire.

The orders being challenged by the Petitioners include an order entered on June 2, 1989 permitting documents of the bank president seized during a search conducted pursuant to a warrant to be turned over to the Commonwealth for use before the grand jury. The other two orders were entered on July 19, 1989. One disqualified Paul R. Rosen, Esquire and Richard E. Miller, Esquire from representing bank employees, other than the bank president, in the course of the grand jury investigation; the other granted the Commonwealth's petition for immunity for Employee B. A similar request for immunity made by the Commonwealth as to four other bank employees was denied.

As part of the grand jury investigation, an assistant district attorney and Detective Thomas Lyons interviewed the bank president on December 6, 1988. The bank president indicated that the public officials had put the funds into the charitable CDs at the lower rate of return, with 1% contributed to the private organization. During an interview with Detective Lyons on December 8, 1988, Employee B indicated that bank confirmation letters had been sent for the charitable CDs.

While testifying before the grand jury, the bank president claimed that the bank was paying the higher rate of return available as well as the percentage contribution to the private organization, rather than the lower rate of return discussed during the investigative interviews. He referred to an undated document containing handwritten instructions to a bank employee to reissue the CDs to reflect the higher rate of return. He attributed his previous failure to disclose the existence of the undated document during the earlier interview to a memory lapse.

Employee B's testimony before the grand jury supported that of the bank president. She testified that the undated document appeared on her desk several months before and that it superseded the written confirmation of the lower return rate that had been sent to the Clerk's office. She acknowledged that she had never sent a confirmation of the higher rate and that it had never been recorded on the computer or in bookkeeping.

Not wont to view the revelation of the undated document as mere oversight on the part of the witnesses, the Commonwealth secured a search warrant authorizing the seizure of documents maintained at the bank evidencing the bank president's activities subsequent to his December 6, 1988 interview. During the execution of the search warrant on February 14, 1989, four pages of handwritten notes found atop the bank president's desk were seized. The bank president contacted Attorney Miller and advised him that the notes had been confiscated.

Attorney Miller immediately contacted the assistant district attorney supervising the grand jury investigation, asserting that the handwritten notes were protected by the attorney-client privilege and the work product doctrine. The assistant district attorney agreed to place the notes in a sealed envelope before the documents were reviewed. The sealed envelope was presented to the Honorable Eugene H. Clarke, Jr., as the supervising judge. The handwritten notes have been kept under seal since that time and were

subject only to the in camera review of Judge Clarke, Jr. This was the appropriate procedure.

The Petitioners moved for return of the handwritten notes. During the hearing on the motion, Attorney Miller indicated that one page of the notes had been prepared by him, and the remainder were the notes of the bank president. Attorney Miller stated that he had written the notes during a session with the bank president after the subpoena to appear before the grand jury had been issued. The notes concerned the documents reviewed and discussions in preparation for the grand jury appearance. The bank president's notes were taken during the discussions also.

The Commonwealth contended that the attorney-client privilege had been waived by the bank president and that the documents fell within the crime-fraud exception to the privilege. The grand jury testimony of the bank president and Employee B was submitted into evidence, along with the Commonwealth's internal memorandum regarding the bank president's interview.

The Petitioners' motion for the return of the handwritten notes was denied on June 2, 1989. The trial judge concluded that the bank president had waived the attorney-client privilege. As to the assertion that the work product doctrine protected the notes, the trial judge held that, assuming it was work product, the crime-fraud exception was applicable.

Immunity for several bank employees was requested by the Commonwealth. The Commonwealth theorized that immunity was necessary, alleging that Employee B had testified falsely as to the existence of the document authorizing the higher rate of return. Believing that a scheme had been developed to whitewash the conduct under investigation, the Commonwealth sought to convince the court that immunity was imperative.

On July 19, 1989, the District Attorney's office's petition for immunity for Employee B was granted. Petitions to grant immunity to other bank employees were denied, al-

though the trial judge indicated that similar requests would be entertained in the future if warranted.

The Commonwealth moved also to disqualify counsel from representing employees of the bank due to their representation of the bank president. The motion for disqualification was granted. The Petitioners' appeal is now before this Court.[1]

No. 99 E.D. Misc. Docket 1989

## I. ATTORNEY–CLIENT PRIVILEGE

■ Petitioners contend that the trial court erred in denying their motion for the return of the handwritten notes, asserting that the notes are protected by the attorney-client privilege as a confidential communication. Petitioners assert further that the attorney-client privilege was not waived. Indeed, Petitioners claim that objection was made immediately to the seizure of the notes and that prompt action was taken to prevent the Commonwealth from conducting any additional review of the notes prior to a determination by the trial court.

The Commonwealth counters with its argument that the attorney-client privilege does not extend to notes that are written for the client's own use. Alternatively, the Commonwealth posits that the notes fall within the crime-fraud exception to the privilege.

The inquiry that must be addressed first is whether a client's memorialization of discussions with his attorney in handwritten notes is a confidential communication subject to the attorney-client privilege.

In *Commonwealth v. Maguigan*, 511 Pa. 112, 124, 511 A.2d 1327, 1333 (1986), this Court stated that the roots of the attorney-client privilege are firmly entrenched in our common law, described fittingly as "... the most revered of

1. Although the extended term of the Investigating Grand Jury of Philadelphia County No. 88–00–3505 expired during the pendency of the appeal, the matter continues to be the subject of an ongoing investigation. The issues presented herein are therefore capable of repetition but may evade review. For that reason, the appeal remains viable.

our common law privileges." We noted that the privilege, as it relates to criminal proceedings, has been codified in this Commonwealth at 42 Pa.C.S. § 5916:

In a criminal proceeding counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client.

We noted that the codification of the privilege merely restates the common law privilege and its attendant case law interpretations.

The statement of the rationale underlying the attorney-client privilege oft-quoted with approval by this Court bears repeating:

"The purposes and necessities of the relations between a client and his attorney require, in many cases, on the part of the client, the fullest and freest disclosure to the attorney of the client's objects, motives and acts. This disclosure is made in the strictest confidence, relying upon the attorney's honor and fidelity. To permit the attorney to reveal to others what is so disclosed, would be not only a gross violation of a sacred trust upon his part, but it would utterly destroy and prevent the usefulness and benefits to be derived from professional assistance. Based upon considerations of public policy, therefore, the law wisely declares that all confidential communications and disclosures, made by a client to his legal adviser for the purpose of obtaining his professional aid or advice, shall be strictly privileged;—that the attorney shall not be permitted, without the consent of his client,—and much less will he be compelled—to reveal or disclose communications made to him under such circumstances." 2 Mecham on Agency, 2d Ed., § 2297.

*Commonwealth v. Maguigan*, 511 Pa. at 124, 125, 511 A.2d at 1334; *Slater v. Rimar, Inc.* 462 Pa. 138, 148, 338 A.2d 584, 589 (1975).

Recognizing that its purpose is to create an atmosphere that will encourage confidence and dialogue between attor-

ney and client, the privilege is founded upon a policy extrinsic to the protection of the fact-finding process. *Estate of Kofsky*, 487 Pa. 473, 409 A.2d 1358 (1979). The intended beneficiary of this policy is not the individual client so much as the systematic administration of justice which depends on frank and open client-attorney communication. *In re Search Warrant B–21778*, 513 Pa. 429, 521 A.2d 422, 428 (1987); *Estate of Kofsky*, supra.

■ To preserve the integrity of the privilege, the burden of proof is upon the party asserting that disclosure of the information would not violate the attorney-client privilege. The question of whether the privilege is properly invoked is to be resolved upon the specific facts of each case. *In re Search Warrant B–21778*, supra; *Maguigan*, supra; *Kofsky*, supra. We find that the privilege has been properly invoked in the instant case.

We have reviewed the handwritten notes that remain under seal. It is without question that the substance of the notations is derived from confidential communications between counsel and the bank president regarding the matter under investigation. The impact of the confidential communications is not diminished by the client's action of reducing the discussions in summary to writing for his own use and for that of his attorney. Nor is the privilege defeated thereby. The same must be said for the notes of the attorney.

The Commonwealth cites our decision in *In re Search Warrant B–21778*, supra, as authority for the proposition that the privilege does not extend to notes that are not written as communications to counsel, but for the client's own use. The circumstances giving rise to our holding in that case are strikingly dissimilar, however.

The search warrant issued in that case covered a client's business records that had been taken to the office of his attorney. We stated explicitly that the case presented no problem of confidential communication and the records sought were not privileged in their own right. The warrant

specified pre-existing tangible evidence in the form of business records, which are not by their very nature encompassed by the privilege.

The handwritten notes involved in the instant case relate to confidential communications between attorney and client. The notes were not created as a business record; nor were their content intended for disclosure to any other individual. Whether the note-taking was prompted by a need to organize the events discussed or to aid a less than perfect memory is of no moment. The notes taken during the privileged communications between the bank president and his counsel must be accorded the same protection as the discussions from which they were derived.

The inquiry does not end, however, without analysis of whether the handwritten notes may be disclosed to the Commonwealth under the crime-fraud exception. The Commonwealth has argued that the notes are not protected by the privilege because they evidence a scheme to fabricate evidence and to obstruct the grand jury inquiry.

The privilege does not protect communications made for the purpose or in the course of the commission of proposed crime or fraud. The crime-fraud exception to the attorney-client privilege was addressed in this Court's decision in *Nadler v. Warner Company*, 321 Pa. 139, 143–144, 184 A. 3, 5 (1936), wherein we stated:

> The reason for the nonapplication of the rule has been variously stated: "... no Court can permit it to be said that the contriving of a fraud can form part of the professional occupation of an attorney or solicitor": *Follett v. Jefferyes*, 1 Sim. (N.S.) 1, 61 Eng.Repr. 1. "In order that the rule may apply there must be both professional confidence and professional employment, but if the client has a criminal object in view in his communications with his solicitor one of these elements must necessarily be absent. The client must either conspire with his solicitor or deceive him. If his criminal object is avowed, the client does not consult his adviser professionally, because it cannot be the solicitor's business to further

any criminal object. If the client does not avow his object he reposes no confidence, for the state of facts, which is the foundation of the supposed confidence, does not exist. The solicitor's advice is obtained by a fraud": *Queen v. Cox,* 14 Q.B.D. 153, 168. "Such communications were not made to the attorney, in his professional capacity, as they were such, as he could not receive in such capacity, and therefore, were not privileged": *Standard Fire Ins. Co. v. Smithhart,* 183 Ky. 679, 685, 211 S.W. 441. See, too, *Matthews v. Hoagland,* 48 N.J.Eq. 455, 469, 21 A. 1054. When the advice of counsel is sought in aid of the commission of crime or fraud, the communications are not "confidential" within the meaning of the statute and may be elicited from the client or the attorney on the witness stand. "There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told": *Clark v. U.S.,* 289 U.S. 1, 15 [53 S.Ct. 465, 469, 77 L.Ed. 993]. See, also, Wigmore, Evidence, Vol. 4, sec. 2298.

The crime-fraud exception is applicable even when the client alone is guilty. The Commonwealth argues that an abuse of the attorney-client privilege has been demonstrated in this case based upon the grand jury testimony and documentary evidence. We are not persuaded, however.

The Commonwealth's claim of abuse requires us in the first instance to reject outright the bank president's grand jury testimony regarding the undated document relating to the higher rate of return and to accept its own characterization of the testimony as an "implausible cover-up". Simply stated, the Commonwealth believes it is so, then it must be so. But, two conclusions conceivably may be drawn from that same evidence—that suggested by the Commonwealth, and that argued by the Petitioners. That is insufficient to satisfy the requisite burden of proof placed upon the Commonwealth to produce prima facie evidence that the

communications were made in the course of the commission of a proposed crime or fraud.

It may well be that the Commonwealth will be able to produce sufficient evidence at a later date that the bank president's testimony was fabricated and intended as a cover-up. Clearly, the Commonwealth hoped to do so by the grant of immunity to Employee B. It is premature, however, on the strength of this record.

We find that the trial court erred in denying the Petitioners' motion to return the handwritten notes and now reverse the order entered on June 2, 1989. In view of our finding, we need not address the issue of the applicability of the work product doctrine.

### No. 130 E.D. Misc. Docket 1989

■ Petitioners appeal also from the trial court's orders entered on July 19, 1989 granting immunity for Employee B and disqualifying counsel from representing bank employees other than the bank president. Petitioners contend that the trial court erred in granting immunity for Employee B because there was no legal or factual basis for concluding that she would refuse to testify or assert her right against self-incrimination.

The Commonwealth counters the Petitioners' argument, asserting that the witness' December 21, 1988 testimony before the grand jury contradicted her statements to Detective Lyons on December 8, 1988 relating to the rate of return formally confirmed by the bank. The Commonwealth argues that the trial court's issuance of the immunity order was proper because the record indicated that Employee B would be likely to refuse to testify or provide information consistent with her earlier statement on the basis of her privilege against self-incrimination if called to appear again before the grand jury, and may be subject to charges of perjury and obstruction of justice if the undated document related to the higher rate of return proves to have been fabricated.

Under 42 Pa.C.S.A. § 5947, a district attorney may request an immunity order, and the supervising judge shall issue such an order, when it is the judgment of the district attorney that,

> (1) the testimony or other information from a witness may be necessary to the public interest; and
>
> (2) a witness has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

42 Pa.C.S.A. § 5947(b).

In *Commonwealth v. Johnson*, 507 Pa. 27, 487 A.2d 1320 (1985), we stated:

> It is clear from § (b) of the Act that the judge to whom a request for immunity is made has no discretion as to whether immunity should or should not be granted. That is entirely within the judgment of the Attorney General or District Attorney. Under the statute, courts have no power to grant immunity except on request of the prosecutor. If the request complies with the Act, then immunity *shall* be granted.

507 Pa. at 32, 487 A.2d at 1322 (Emphasis supplied.) Our inquiry is limited then to a determination of whether the trial court erred in concluding that the Commonwealth's request complied with the Act. We find that the trial court's issuance of the immunity order was proper in this case.

The grant of immunity is an extraordinary benefit conferred on a witness. *In re Falone*, 464 Pa. 42, 346 A.2d 9 (1975). Its use contemplates that the public interest may sometimes be served best by conferring that benefit on a witness in return for disclosure of information possessed by the witness. To that end, the Legislature has entrusted the determination of when the grant of immunity may advance the public interest to the district attorney subject to approval of the court. If the Commonwealth is able to establish to the court's satisfaction that the grant of immunity is necessary, then the immunity order shall be issued.

The petition for immunity described the December 8, 1988 statement made by Employee B to Detective Lyons confirming that the charitable CDs paid the lower rate of return, as well as her testimony before the grand jury on December 21, 1988 that an undated document had appeared on her desk several months earlier which superseded the bank's written confirmation of the lower rate of return. Proceeding on the theory that the undated document was fabricated to cover-up the scheme to divert public funds, the Commonwealth asserted that Employee B's testimony under the grant of immunity was necessary to the public interest. The Commonwealth properly established the need for the grant of immunity and the trial court's issuance of the order was proper. We affirm the order of the trial court granting immunity for Employee B.

■ Finally, we must address the Petitioners' contention that the trial court erred in disqualifying counsel from representing bank employees other than the president. Petitioners claim that the trial court's ruling establishes an unprecedented standard for disqualification. Relying upon this Court's decision in *Pirillo v. Takiff*, 462 Pa. 511, 341 A.2d 896 (1975), Petitioners assert that the bank president's status as a target of the grand jury investigation does not justify disqualification of counsel.

Although we agree with Petitioners that our decision in *Pirillo* did not create an absolute prohibition against multiple representation of witnesses in a grand jury investigation, we must reject the Petitioners' extension of that analysis in this case. In *Pirillo*, we upheld the order of a supervising judge of an investigating grand jury disqualifying a single attorney and his associate, who were paid by a policeman's fraternal order, from representing all of the policemen subpoenaed to testify before the grand jury. We held that it was inappropriate for the supervising judge to permit multiple representation where each witness was a potential defendant and the court had received information that the testimony of each officer might be expected to incriminate one or more of the other witnesses.

The competing interests of the witnesses to counsel of their own choosing, of the attorneys to pursue the practice of law, and of the Commonwealth to insure that the grand jury's function is not unduly impaired have been thoroughly addressed in our opinion in *Pirillo* and need not be restated herein. In balancing the interests of the Commonwealth and of the Petitioners, we will address the four considerations outlined in *Pirillo:*

"(1) Whether the state interest[s] sought to be achieved can be effectively accomplished in some manner which will not infringe upon interests protected by constitutional rights;

(2) Whether the state interest[s] [are] sufficiently compelling when compared with the interests affected, [to justify] any infringement of those interests; (3) Whether the state interest[s] [are] sufficiently compelling to justify the degree of infringement that is necessary to effectuate that interest; (4) Whether the provision under challenge represents the narrowest possible infringement consistent with effectuating the state interest involved." *Moore v. Jamieson,* 451 Pa. 299, 310–11, 306 A.2d 283, 289 (1973). 462 Pa. at 529, 530, 341 A.2d at 905.

We find that the interests of the Commonwealth justify the narrow infringement imposed upon the Petitioners' interests. The concern for multiple representation expressed by the Commonwealth emanated from the abrupt change in the version of events given by the bank president in the weeks between the statement to the detective and his appearance for the grand jury. Thereafter, the bank president became a target of the investigation.

The shift in the inquiry of the grand jury to encompass that development triggered concern for counsel's representation of the bank president and other employees. As we stated in *Pirillo,*

The existence of multiple representation jeopardizes the time-honored concept of grand jury secrecy. Such secrecy is designed to protect the Commonwealth, the grand jurors, and the witnesses. *Commonwealth v. Kirk,* 141

Pa.Super. 123, 14 A.2d 914 (1940) aff'd. 340 Pa. 346, 17 A.2d 195 (1941). Cf. Pa.R.Crim.P. 206–208; 18 Pa.C.S. § 5103. If one of the witnesses reveals his testimony before the grand jury to his attorney, as he has every right to do, certainly the attorney will feel obliged, perhaps even subconsciously, to reveal to his other clients the testimony of the first witness. With the attorney in such a position, either the attorney-client relationship or the grand jury secrecy must suffer. Similarly, if, as will be shown, there is an attorney-client relationship between Attorney Pirillo and the F.O.P., then Pirillo might be compelled to advise the F.O.P. as to the testimony of the several petitioner/witnesses. These revelations could be inimical to the interests of not only the Commonwealth and the grand jurors, but also to the individual witnesses themselves, all of whom are intended beneficiaries of the traditional grand jury secrecy.

462 Pa. at 525, 526, 341 A.2d at 903, footnote 5. Our observation is particularly compelling in this case.

It was the trial court's responsibility to curtail any abridgment of the grand jury's function to investigate public wrongs. The trial court's order effectively prevented the possibility that the continuing representation of the bank president and other witnesses would deteriorate the efficacy of counsels' representation of the potentially conflicting interests of individual witnesses. The right of a witness to be represented by particular counsel is not absolute. It may be overridden by individual constitutional guarantees. It has in this case, and properly so. The order of the trial court disqualifying Paul R. Rosen, Esquire and Richard E. Miller, Esquire as counsel is affirmed.

NIX, C.J., concurs in the result.

McDERMOTT, J., files a dissenting opinion.

McDERMOTT, Justice, dissenting.

I agree with the majority's holdings regarding the propriety of the trial court's orders on immunity and counsel

448

disqualification. I disagree, however, with the majority's treatment of the disputed handwritten notes. I do not quarrel that one's confidences by and between their attorney are privileged. If, however, their communication, reduced to writing, is left for others to see, it cannot be shielded from a legally posited search.