992 A.2d 65

NATIONWIDE MUTUAL INSURANCE COMPANY, Nationwide Mutual Fire Insurance Company, Nationwide General Insurance Company, Nationwide Property & Casualty Insurance Company and Colonial Insurance Company of Wisconsin f.k.a. Colonial Insurance Company of California, Appellants

v.

John FLEMING, Joshua Meeder, Meeder Fleming & Associates, Inc., Moraine Group, Inc., Mary Lou Fleming, Andrea Meeder, Robert Dean, John Williams, Barbara Reddick, Ray Kooser, Sandy Kooser, David Colley, Connie Taylor, Michele Daugherty, Lon McAllister, and Lon McAllister Agency, Appellees.

Supreme Court of Pennsylvania.

Argued March 6, 2008.

Decided Jan. 29, 2010.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## *ORDER*

PER CURIAM.

AND NOW, this 29th day of January, 2010, the January 4, 2010 Resubmission Order is hereby **VACATED.** The Court being equally divided, the order of the Superior Court is **AFFIRMED.**

Justice EAKIN files an Opinion in Support of Affirmance, which is joined by Justice BAER.

Justice SAYLOR files an Opinion in Support of Reversal, which is joined by Chief Justice CASTILLE.

Justice TODD and Justice McCAFFERY did not participate in the consideration or decision of this matter.

## *OPINION IN SUPPORT OF AFFIRMANCE*

Justice EAKIN.

Appellants, Nationwide Mutual Insurance Company, *et al.*, sued several former agents and their respective insurance agencies, collectively appellees, for breach of contract and intentional interference with contractual relations. Appellants asserted appellees accessed confidential policyholder information on appellants' computer network and provided the information to competitors upon leaving appellants' employ. Appellees argued they were merely participating in permissible post-termination competition, and appellants did not have any proprietary interest in the information. On this basis, appellees counterclaimed, contending appellants brought suit in bad faith. A bench trial ensued.

During trial, appellees' counsel questioned appellants' former president regarding several documents appellants produced during discovery, including Document 529, which they sought to introduce to support their counterclaim. Appellants contended the attorney-client privilege protected Document 529, and only disclosed its recipient list, date, and subject line; they redacted the substantive content. The privileged nature of Document 529 is the issue underlying this appeal; it was filed under seal and remains sealed.

An attorney from appellants' general counsel authored Document 529 and sent it to 15 of appellants' employees, including officers, managers, and three other attorneys. Generally, Document 529 contains this counsel's assessment of the agent defections and appellants' strategy underlying the lawsuits against its former agents. It further states appellants cannot reasonably expect the lawsuits to succeed, and states the "primary purpose" of the litigation is to send a message to current employees contemplating defection.

The trial court held an *in camera* hearing to determine whether the attorney-client privilege applied to Document 529. Appellees argued appellants waived any privilege when they disclosed Documents 314 and 395, also regarding agent defections. Like Document 529, Document 314 was authored by an attorney from appellants' general counsel office; it outlined why appellants severed their relationship with certain agents and noted the necessity of obtaining information from defecting agents in order to consider appellants' legal options against them and their new employers. It was addressed to seven of appellants' employees, including two other attorneys in appellants' general counsel office. Document 395 was authored by appellants' agency administration director. It set forth additions and changes to the "Reflex Action Plan," appellants' policy for dealing with agent defections, and was sent to 35 of appellants' employees and officers.

The trial court held the voluntary disclosure of Documents 314 and 395 waived the attorney-client privilege with respect to Document 529. It determined appellants used the privilege to their advantage by producing communications in support of

their position, but withheld Document 529 as privileged because it did not support their position; the court stated "the attorney-client privilege cannot be used as both a shield and a sword." Trial Court Opinion, 2/16/05, at 4.

Appellants appealed and requested a stay, which the trial court granted. The Superior Court granted appellees' motion to quash the appeal for lack of jurisdiction. By *per curiam* order, this Court granted review, vacated the Superior Court's order, and remanded to the Superior Court for further proceedings. *Nationwide Mutual Insurance Company v. Fleming*, 586 Pa. 622, 896 A.2d 565 (2006) (*Nationwide I* ).

The Superior Court affirmed the trial court's decision regarding Document 529 on alternative grounds. *Nationwide Mutual Insurance Company v. Fleming*, 924 A.2d 1259, 1269 (Pa.Super.2007) (*Nationwide II* ).[1] Citing codification of the attorney-client privilege, 42 Pa.C.S. § 5928, the court determined it protects only confidential communications from a client to an attorney "made in connection with the providing of legal services or advice." *Nationwide II*, at 1264 (citations omitted). Communications from attorney to client are privileged only to the extent they contain and would reveal confidential communications from the client. *Id.*

The court initially set forth Pennsylvania's two-part inquiry for determining whether the attorney-client privilege applies to preclude disclosure: whether the privilege applies to a communication, and if it does, whether client waiver or an exception applies to overcome the privilege and allow disclosure. *Id.*, at 1265–66. The Superior Court also held the client can waive the privilege by disclosing the communication at issue to a third party. *Id.*, at 1265. Additionally, federal decisions have held that when a communication protected by the privilege is voluntarily disclosed, the privilege is waived "for *all* communications pertaining to the same subject matter." *Id.* (emphasis in original).

1. Justice McCaffery, then a Superior Court Judge, authored the opinion.

The court noted Document 529 was a communication from counsel to a corporate client, addressing agent defections. Since the privilege only protects attorney-to-client communications containing and revealing confidential client-to-attorney communications, and Document 529 neither contained nor revealed such communications, the court concluded it did not satisfy the requirements for the privilege's protection. *Id.,* at 1268.

We granted allowance of appeal on the following question:

Whether the Superior Court erred as a matter of law in holding that the attorney-client privilege did not apply to a confidential memorandum written by [appellants]' in-house senior counsel to its senior executives and attorneys which related to pending and future litigation and reflects confidential information previously shared by the client with the attorney, as well as the attorney's legal advice?

*Nationwide Mutual Insurance Company v. Fleming,* 594 Pa. 311, 935 A.2d 1270 (2007). Since the privilege is codified at 42 Pa.C.S. § 5928, this is a question of statutory interpretation, and a pure question of law. *Commonwealth v. Bortz,* 589 Pa. 431, 909 A.2d 1221, 1223 (2006). Questions of law are subject to a *de novo* standard of review, and our scope of review is plenary. *Craley v. State Farm Fire and Casualty Company,* 586 Pa. 484, 895 A.2d 530, 539 n. 14 (2006). "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a). "When the words of a statute are clear and free from all ambiguity, they are presumed to be the best indication of legislative intent." *Chanceford Aviation Properties, L.L.P. v. Chanceford Township Board of Supervisors,* 592 Pa. 100, 923 A.2d 1099, 1104 (2007) (citation omitted). We address only the privilege as applied to attorney-to-client communications and emphasize this case does not involve the work-product doctrine; appellants have claimed only the attorney-client privilege. Neither party has challenged the enactment of an attorney-client privilege stat-

ute on the grounds it is a procedural rule in violation of Article V, § 10(c) of the Pennsylvania Constitution.[2]

Appellants argue the Superior Court's holding chills, if not negates, the attorney-client privilege's purpose—to foster confidence and dialogue between attorney and client to benefit the administration of justice, citing *In re: Investigating Grand Jury of Philadelphia County No. 88–00–3503*, 527 Pa. 432, 593 A.2d 402, 406 (1991). Appellants also claim the court's decision is at odds with *National Bank of West Grove v. Earle*, 196 Pa. 217, 46 A. 268 (1900), holding the privilege applies to all attorney-to-client communications. *Id.*, at 269. The Superior Court did not mention *Earle;* appellants ask this Court to reaffirm *Earle*'s vitality, though it has not been cited by this Court since it was decided. Appellants contend, pursuant to the Statutory Construction Act, 1 Pa.C.S. § 1922(4),[3] the reenactment of 28 P.S. § 321 at 42 Pa.C.S. § 5928, without substantive changes, evidenced an intent for the codification to be construed as in *Earle*.

Appellees argue the Superior Court's holding correctly applied § 5928 and Pennsylvania's case law. Appellees first assert Document 529 does not contain or reveal confidential client-to-attorney communications, but contains only legal advice. If this document is found to be privileged, they contend appellants waived the privilege by selectively disclosing similar subject matter in an attempt to gain a tactical advantage.

**2.** The relevant portion of Article V, § 10(c) provides:

(c) The Supreme Court shall have the power to prescribe general rules governing practice, procedure and the conduct of all courts, . . . if such rules are consistent with this Constitution and neither abridge, enlarge nor modify the substantive rights of any litigant, nor affect the right of the General Assembly to determine the jurisdiction of any court or justice of the peace, nor suspend nor alter any statute of limitation or repose. All laws shall be suspended to the extent that they are inconsistent with rules prescribed under these provisions.
Pa. Const. art. V, § 10(c).

**3.** Section 1922(4) provides:

That when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language.
1 Pa.C.S. § 1922(4).

474

Appellees cite *Murray v. Gemplus International*, 217 F.R.D. 362 (E.D.Pa.2003) (where party attempts to utilize privilege as weapon, via selectively disclosing communications, party waives privilege), and *Minatronics v. Buchanan Ingersoll*, 23 Pa. D. & C.4th 1, 18–21 (Allegheny Co.1995) (voluntary disclosure of confidential information to gain tactical advantage waives attorney-client privilege for all communications involving same subject matter). Appellees finally assert legal opinions are discoverable where they are directly relevant to a cause of action.

The purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Company v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *see also In re: Investigating Grand Jury of Philadelphia County*, at 406 (recognizing privilege's purpose is to create atmosphere encouraging confidence and dialogue between attorney and client, and intended beneficiary is not client so much as administration of justice). *Upjohn* further provided, "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn*, at 389, 101 S.Ct. 677.

Pennsylvania codified the privilege in 1887. *See* Act of May 23, 1887, P.L. 158, § 5d (formerly 28 P.S. § 321). This privilege statute was reenacted in 1976 without substantive changes and states, "In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa.C.S. § 5928.

"[O]nce the attorney-client communications have been disclosed to a third party, the privilege is deemed waived." *Joe v. Prison Health Services, Inc.*, 782 A.2d 24, 31 (Pa.Cmwlth. 2001). Like the trial court, I would find this matter turns on waiver. The trial court relied on *Minatronics*, an Allegheny

County Court of Common Pleas decision, for the proposition voluntarily disclosing confidential communications "waive[s] the privilege as to every confidential communication ... involving the same subject matter." *Minatronics*, at 18; *see* Trial Court Opinion, 2/16/05, at 3. The issue in *Minatronics* was whether the inadvertent disclosure of confidential communications waived the privilege as to other confidential communications containing the same subject matter. The *Minatronics* court also noted significant support for the position that such disclosure does not waive the privilege "where there is no apparent prejudice to the party seeking further disclosure[,]" because "where it is clear that the limited disclosure is not being used [as a sword and a shield], there is no justification for applying a subject matter waiver." *Minatronics*, at 19–20. The court held the inadvertent disclosures at issue did not waive the attorney-client privilege, and further opined, "the law should not discourage parties from voluntarily disclosing confidential communications (unless made for the purpose of achieving a tactical advantage) by adopting a rule of law that causes voluntary disclosures to operate as a waiver of other confidential communications involving the same subject matter." *Id.,* at 20–21.

The trial court also relied on *Murray,* a United States District Court decision from the Eastern District of Pennsylvania, holding the defendant waived its attorney-client privilege as to intentionally disclosed documents and their subject matter. *Murray,* at 367. The *Murray* court noted the defendant "seems to have produced only the documents that are most beneficial to its defense...." *Id.,* at 366. *Murray* found "the argument that when one party intentionally discloses privileged material with the aim, in whole or in part, of furthering that party's case, the party waives its attorney-client privilege with respect to the subject-matter of the disclosed communications" persuasive. *Id.,* at 367.

The reasoning in *Murray* and *Minatronics* is instructive. Appellants never alleged Documents 314 and 395 are privileged or were unintentionally disclosed. Rather, appellants claim Documents 314 and 395 are business communications

which do not contain confidential communications made in connection with providing legal services or advice. Read together, however, Documents 314, 395, and 529 contain the same subject matter—appellants' response to agent defections. Document 529 contains counsel's opinion-based outline regarding the ongoing activities for dealing with the defections, specifically, litigation efforts in Pennsylvania and New York. In Document 529, counsel states the litigation's primary purpose—to send a message to current employees contemplating defection—and concedes the likelihood of receiving a damages award is remote. Counsel notes his office's participation in modifying the Reflex Action Plan, and suggests edits for appellants' no-compete contract.

Like Document 529, Document 314 was authored by an attorney in appellants' general counsel office and the words "privileged and confidential" appear in its heading. Documents 314 and 529 contain counsel's understanding of the agent defections. Like Document 529, Document 395 discusses the Reflex Action Plan. Document 395 explains modifications to the Reflex Action Plan in order to efficiently deal with a large agent defection, a product of counsel's advice and input, as noted by counsel in Document 529.

Thus, the disclosure of Documents 314 and 395 form the basis of subject matter waiver of the attorney-client privilege regarding Document 529, the scope of which extends to Document 529 because it contains the same subject matter. What distinguishes Document 529 from Documents 314 and 395 is counsel's unflattering concessions regarding the litigation's purpose and prospect of succeeding. As in *Murray,* appellants seem to have produced only the documents beneficial to their case by disclosing Documents 314 and 395, and withholding Document 529 based on its privileged nature. I believe appellants waived the attorney-client privilege with respect to the subject of agent defections upon disclosing Documents 314 and 395, and cannot claim the privilege applies to a document containing the same subject matter, as well as potentially

damaging admissions. Because I conclude this matter turns on waiver, I would decline to address the merits.

Justice BAER joins this Opinion in Support of Affirmance.

## OPINION IN SUPPORT OF REVERSAL

Justice SAYLOR.

I respectfully differ with the determination of the Justices favoring affirmance that, because Appellants voluntarily disclosed Documents 314 and 395, they waived the attorney-client privilege with respect to Document 529. *See* Opinion in Support of Affirmance, at 69–70.

As a preliminary matter, I recognize that this case presents a threshold issue of first impression, specifically, whether the same subject matter waiver doctrine should be adopted by this Court, as it has been in the federal arena. *See* Fed.R.Evid. 502(a) & advisory committee notes.[1] Notably, federal courts have supplied factors for courts to consider when applying the doctrine. *See, e.g., Fort James Corp. v. Solo Cup Co.,* 412 F.3d 1340, 1349–50 (Fed.Cir.2005) ("There is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought[,] and the prejudice to the parties of permitting or prohibiting further disclosures." (citation omitted)).

Applying such a subject matter litmus, it seems that Appellants have not waived the attorney-client privilege with respect to Document 529, because Documents 314 and 395, which were disclosed, do not appear to contain the same subject matter as Document 529. As a general principle, when assessing whether a party has implicitly waived the attorney-client privilege,

> we start with the unarguable proposition that the attorney-client privilege is highly valued. Accordingly, courts should be cautious about finding implied waivers. Claims of im-

1. The Pennsylvania Rules of Evidence do not contain a similar rule. *See* Pa. R. Evid. 101, *et seq.*

plied waiver must be evaluated in light of principles of logic and fairness. That evaluation demands a fastidious sifting of the facts and a careful weighing of the circumstances. Considering the need for this precise, fact-specific [examination], it is not surprising that the case law reveals few genuine instances of implied waiver.

*In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 23 (1st Cir.2003) (citations omitted).

Facially, Documents 314, 395, and 529 pertain to the "same subject matter," in the broadest sense of the phrase, as they all deal with some aspect of agent defections. *See* Opinion in Support of Affirmance, at 69–70. Document 395 describes the Reflex Action Plan (the practices that Appellants' agencies should follow when agents defect), Document 314 includes counsel's understanding regarding the defection of certain agents, and Document 529 summarizes the legal actions taken by Appellants concerning agent defections. *See* R.R. 31a–62a.

However, a closer examination of the communications highlights their differences. Document 395 is a comprehensive business manual detailing the various practices that should be applied when dealing with defecting agents. *See id.* at 32a–62a. Document 314 is a one-page e-mail drafted by an in-house attorney that specifies, by way of four bullet points, his understanding of the defection of four agents in Pennsylvania. *See id.* at 31a. Notably, Document 314 states, *inter alia*, that, "[O]ur office will begin assessing and preparing to execute our legal options, both against the agents and possibly the companies they are moving to, and will advise management of those options for a decision." R.R. at 31a.

By contrast, although it is also written by in-house counsel, Document 529 describes, among other things, the present litigation in several states involving Appellants, their former agents, and their new companies. Namely, it discusses the nature of these suits, the money damages sought, the purpose behind the litigation, Appellants' likelihood of success, and the other remedies available to Appellants against defecting agents. It also includes counsel's recommendations regarding

Appellants' use of specific contract provisions, as well as the possibility of filing complaints with the insurance departments of certain states. Accordingly, given the principle that courts should be cautious in finding an implied waiver of the attorney-client privilege, and the contents of the communications, it seems that Appellants did not waive the attorney-client privilege with respect to Document 529 by disclosing Documents 314 and 395.

In addressing the scope of the attorney-client privilege, I agree with the Justices favoring affirmance that Document 529 reveals confidential client communications. *See* Opinion in Support of Affirmance, at 68–69. For example, in the opening passage of the memorandum, the in-house-attorney author relates the collective knowledge held by management and in-house counsel regarding the operational impact of agent defections and a business-related judgment, which apparently had been made concerning the necessity of all reasonably possible responsive action. This passage both reveals information apparently communicated by management and, more generally, reflects in-house counsel's knowledge apparently derived from familiarity with business aspects. The memorandum proceeds to detail strategies that appear to reflect prior decisions made by management upon legal consultation, rather than pure legal advice.

I agree with *amici curiae,* The Association of Corporate Counsel, Pennsylvania Bar Association, Philadelphia Bar Association, Chamber of Commerce of the United States of America, and Pennsylvania Chamber of Business and Industry, that Document 529 exemplifies the substantial difficulty with a narrow approach to the attorney-client privilege rigidly centered on the identification of specific client communications, in that attorney advice and client input are often inextricably intermixed. *See* Brief for *Amici* The Ass'n of Corporate Counsel, *et al.* at 20 ("[T]he communication clearly was made for the purpose of providing legal advice and necessarily draws on, and cannot be separated from[,] the Appellants' communications with counsel. If analysis and legal opinions such as that expressed by counsel in Document 529 were not

deemed privileged, in-house counsel would be prevented from effectively performing the professional duties for which they were hired and their clients would not be afforded the protection of lawyer-client confidentiality that they have a right to expect.").[2] As succinctly explained by *amici curiae* Energy Association of Pennsylvania and Pennsylvania Telephone Association:

> [Many business enterprises] conduct their businesses in highly regulated environments, and they rely on their counsel—particularly those in their own legal departments—to monitor changes in statutes and regulations and judicial and agency interpretations of the law and then to advise corporate managers about those changes and how corporations should respond to them. They likewise rely on their in-house lawyers to serve as ongoing monitors of corporate compliance with the law. The lawyers who regularly serve the *Amici* Associations' members, especially the counsel who are full-time employees, are exposed to a continuous stream of client communications (many of which are clearly confidential client communications in the traditional sense). These client communications are not only oral and written, but are observational as well. A business that brings a lawyer inside its operations does so with the expectation that the lawyer will observe its operations, so that the lawyer can proactively render advice without waiting for a formal, discrete request. Providing the opportunity for such observation is a form of client communication to the lawyer and is, in essence, a standing request for legal advice. The lawyer's advice, in turn, is necessarily based on the totality of client communications.

> To disclose the lawyer's advice is necessarily to disclose something about the operation of the client's business that was communicated to the lawyer through various media, including the lawyer's privileged observations. . . .

**2.** These *amici* correctly recognize the attorney-client privilege does not protect a client from an investigation of the facts in a given matter; rather, it is limited to communications made within the client/lawyer relationship. *See* Brief for *Amici* The Ass'n of Corporate Counsel, *et al.* at 21.

The Superior Court's holding is based on a narrow, formal-
istic view of attorney/client communications that is unrealis-
tic. It fails to account for the full panoply of responsibilities
lawyers—particularly "in-house" lawyers—have to counsel
their corporate clients about an increasingly broad array of
ever-changing legal requirements. The Superior Court's
holding, if not reversed, is likely to create unnecessary
impediments to the counseling of clients and could under-
mine one of the important goals of the privilege: frank
communication to aid in compliance with the law and other-
wise to provide necessary legal representation. Because
businesses must operate in an increasingly complex legal
environment, a closer, rather than more formal and distant
relationship should be encouraged between client and coun-
sel. A reliably confidential relationship between counsel
and client is needed more than ever for companies to
operate as the good citizens the people of the Common-
wealth expect them to be.

Brief for *Amici* Energy Ass'n of Pa. and Pa. Tel. Ass'n at 1–3.[3]

According to the above *amici*, the Superior Court's opinion
"poses inordinate practical difficulties" that make it adminis-

3. *Accord* Brief for *Amici* The Ass'n of Corporate Counsel, *et al.* at 8–9
("In a business and regulatory environment that demands corporate
accountability, in-house counsel must be proactive in ensuring compli-
ance with the law and cannot simply react to communications and
questions from their corporate clients, many of whom may have diffi-
culty keeping pace with or understanding the vast number and com-
plexity of regulations and liabilities that may impact their work. A
significant part of the job of any in-house lawyer is to provide confiden-
tial legal advice based on what the lawyer observes directly from within
a company."); *id.* at 14 ("[T]he communication of legal advice on the
lawyer's own initiative in this context cannot be divorced from the
totality of the confidential information that the lawyer knows about the
client."); *id.* ("[T]he nature of the relationship between in-house coun-
sel and corporate clients makes it all but impossible for communica-
tions related to the provision of legal advice *not* to reveal, implicitly or
explicitly, client confidences exchanged during the course of the profes-
sional relationship. The legal services provided by in-house counsel are
particularly valuable to businesses precisely because they draw on
counsel's experience, observations, and ongoing communications with a
corporate client."). *See generally In re LTV Secs. Litig.*, 89 F.R.D. 595,
602 (N.D.Tex.1981) ("Whatever the conceptual purity of [a rule cen-
tered on specific revelation of client communications], it fails to deal

482

tratively and judicially unworkable. Brief for *Amici* The Ass'n of Corporate Counsel, *et al.* at 15 (quoting *Spectrum Sys. Int'l Corp. v. Chem. Bank,* 78 N.Y.2d 371, 575 N.Y.S.2d 809, 581 N.E.2d 1055, 1061 (1991)); *see also id.* ("Because the Superior Court's holding rests on an unrealistic dichotomy between confidential client communications and a lawyer's providing of legal services, lawyers, clients, and judges will vary widely in their determinations of what attorney communications are privileged and the application of the privilege will become uncertain."). The argument continues:

> The practical difficulties of determining when a lawyer's communications incorporate or otherwise tacitly refer to a client's communications "lead[s] to uncertainty as to when the privilege will apply." [*LTV Secs. Litig.,* 89 F.R.D. at 603]. Yet, "if the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected." *Upjohn [Co. v. United States],* 449 U.S. [383,] 392 [101 S.Ct. 677, 66 L.Ed.2d 584] (1981). The Superior Court's holding will reduce Pennsylvania's attorneys to guessing when their own legal advice may be privileged, leaves clients uncertain as to when their lawyers' communications are confidential, and, consequently, will significantly disrupt the free and candid exchange of information between attorneys and clients. "An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Id.* at 393 [101 S.Ct. 677].

Brief for *Amici* The Ass'n of Corporate Counsel, *et al.* at 16.

While I acknowledge that the core concern underlying the attorney-client privilege is the protection of client communications, due to the unavoidable intertwining of such communication and responsive advice, I would remain with the pragmatic approach reflected in *Nat'l Bank of West Grove v. Earle,* 196 Pa. 217, 221, 46 A. 268, 269 (1900). Although this may

with the reality that lifting the cover from the [legal] advice [provided by an attorney] will seldom leave covered the client's communication to his lawyer.").

inevitably extend some degree of overprotection, I find it to be consistent with the policies underlying the privilege and the relevant legislative direction, particularly in light of the principle of statutory construction pertaining to legislative reenactments. *See* 1 Pa.C.S. § 1922 ("[W]hen a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language.").[4] Moreover, the approach is consistent with that of a majority of jurisdictions, *accord* Restatement (Third) of the Law Governing Lawyers §§ 68–70 & § 69 cmt. i (2000), which yields greater consistency for the many corporations doing interstate business. I recognize that this Court has issued a few decisions in tension with *Earle;* however, none has entailed a deeper reassessment of the attorney-client privilege in Pennsylvania, as this case was selected to achieve.[5]

For the above reasons, I would reverse the order of the Superior Court.

Chief Justice CASTILLE joins this Opinion in Support of Reversal.

---

4. As Appellants explain, in 1976, the Legislature reenacted the privilege statute which was in effect as of the issuance of *Earle* without making any substantive changes to it. *See* Act of July 9, 1976, P.L. 586, No. 142, § 2 (codified at 42 Pa.C.S. § 5928).

5. For example, the sole allusion to the attorney-client privilege in *Slater v. Rimar, Inc.,* 462 Pa. 138, 338 A.2d 584 (1975), is in the form of a passing reference to a prominent treatise. *See id.* at 148 n. 8, 338 A.2d at 589 n. 8. Otherwise, *Slater* concerned asserted violations of the Canons of Professional Ethics and the procedures employed to redress them.