2016 PA Super 13

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| TIMOTHY M. CURLEY, | |
| Appellant | No. 299 MDA 2015 |

Appeal from the Order Entered January 14, 2015
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s):
CP-22-CR-0003614-2013
CP-22-CR-0005165-2011

BEFORE:  BOWES, JENKINS, AND PLATT,* JJ.

OPINION BY BOWES, J.:                    **FILED JANUARY 22, 2016**

Timothy M. Curley appeals from the order denying his pre-trial motions to preclude the introduction of testimony of Attorney Cynthia Baldwin[1] and quash certain criminal charges against him based on violations of the attorney-client privilege.[2]  We reverse the trial court's order in which

---

[1]  Ms. Baldwin is a former Justice of the Pennsylvania Supreme Court. Consistent with the parties and trial court below, and to avoid confusion, we have not referred to her as Justice Baldwin since she was not acting in a judicial capacity.

[2] We have jurisdiction over this appeal pursuant to the collateral order doctrine codified at Pa.R.A.P. 313.  **See Commonwealth v. Schultz**, ___ A.3d ___ (Pa.Super. 2015).

[*]  Retired Senior Judge assigned to the Superior Court.

it found that no attorney client privilege existed. For the reasons that follow, we hold that Ms. Baldwin was incompetent to testify as to Curley's communications with her. Accordingly, we quash the count of obstruction of justice and the related conspiracy charge.

In these actions, the Commonwealth has charged Curley with two counts of endangering the welfare of a child ("EWOC"), and one count each of perjury, failure to report suspected child abuse, obstruction of justice, and conspiracy.[3] The charges stem from: 1) his treatment of allegations of sexual misconduct against Gerald "Jerry" A. Sandusky, the former defensive coordinator for the Penn State football team, and founder of a non-profit charity serving underprivileged youth, the Second Mile; and 2) his testimony pertaining to his handling of those matters before an investigating grand jury.[4]

Curley is the former Athletic Director of the Pennsylvania State University ("Penn State" or "University"). In 2009, the Pennsylvania Office of Attorney General ("OAG") began investigating allegations that Sandusky

---

[3] The Commonwealth filed a single conspiracy count, which included conspiracy to commit perjury, obstruction of justice, and endangering the welfare of a child.

[4] Our recitation of the facts is based on the certified record, including the grand jury presentments, unsealed testimony, and the factual findings of the trial court. Insofar as Appellant's testimony was not credited by the trial court, we have not relied on that version of events. However, where the testimony was not in dispute, we have considered it.

sexually abused children over an extended period. As part of the investigation, the OAG convened a statewide investigating Grand Jury. During the course of the investigation, the OAG learned of sexual misconduct by Sandusky that occurred while he was on the campus of Penn State in 2001, as well as an incident involving inappropriate behavior with a minor in 1998.

The grand jury investigation revealed the following regarding the 1998 matter. That incident involved an eleven-year-old boy. *See* Thirty-Third Statewide Investigating Grand Jury Sandusky Presentment, at 18 (hereinafter Sandusky Presentment); *see also* Thirty Third Investigating Grand Jury Presentment No. 29. Sandusky transported the victim from the victim's home to Penn State. Sandusky Presentment at 18. On the way to the University, Sandusky placed his right hand on the boy's thigh on multiple occasions. *Id*. The pair lifted weights for approximately twenty minutes before playing a game with a tape ball and cups. *Id*. Sandusky then wrestled with the victim, before instructing the boy to shower. *Id*. The youngster attempted to shower away from Sandusky, but Sandusky beckoned him closer and told him that he warmed up a shower for the child. *Id*. at 18-19. Sandusky grabbed the boy from around his waist, lifting him into the air. *Id*. at 19. He also washed the boy's back and bear hugged the child from behind, before rinsing the child's hair. *Id*.

When Sandusky returned the child to the boy's home, the child's mother noticed that his hair was wet and became upset when she discovered that he had showered with Sandusky. *Id*. She reported the matter to University Police, who initiated an investigation. *Id*. University Police conducted a wiretap on Sandusky, with the permission of the boy's mother, recording two conversations. *Id*. Sandusky admitted to showering naked with the child, and at one point stated that he wished he were dead. *Id*. at 20. He also told police that he hugged the child in the shower and admitted that it was wrong. *Id*. No charges were ultimately filed.

The grand jury investigation also revealed that in 2001, former Penn State assistant football coach, Michael McQueary, who had been a quarterback at Penn State, witnessed Sandusky commit a sexual assault against a minor victim in a locker room shower on the main campus of the University in February of 2001. *Id*. at 6. McQueary, then a graduate assistant, reported this incident to head football coach Joe Paterno the next day, a Saturday. *Id*. at 7. Paterno, in turn, reported the matter to Curley the following day. *Id*. Within two weeks of the shower incident, McQueary met with Curley and Gary Schultz, the Vice President for Finance and Business. *Id*. McQueary, who testified before the grand jury prior to January 12, 2011, stated that he told the pair that he believed he saw Sandusky having anal sex with a minor boy. *Id*.

Curley was originally subpoenaed in December of 2010 to testify before the investigating grand jury on January 12, 2011. Ms. Baldwin alerted Curley to the subpoena on December 29, 2010, while Curley and she were in Tampa, Florida for a Penn State football bowl game.[5] The pair subsequently met, on January 3, 2011, after returning to State College, for purposes of preparing Curley for his grand jury appearance. She agreed to advise and be present for Curley's grand jury testimony. Specifically, Ms. Baldwin related to Curley that, as a grand jury witness, he was entitled to an attorney who could attend and consult with him during his testimony. She explained that he was free to retain a different attorney, but she could also represent him at the proceeding as well.

According to Ms. Baldwin, she instructed Curley that she was general counsel for Penn State and that any information he told her was not confidential because she was the University's attorney and could relate the information to the Board of Trustees. Specifically, Ms. Baldwin set forth, "I explained to him that I could go in [to the grand jury room], but I was general counsel for Penn State, that there was no confidentiality. And I emphasized that there was no confidentiality.[.]" N.T. Curley Hearing,

_____

[5] Ms. Baldwin was also served a subpoena *duces tecum*, Grand Jury Subpoena 1179, for University documents, which sought documents referencing or related to Jerry Sandusky.

11/20/14, at 93. She continued, "there was no confidentiality between Mr. Curley and me because I was the university's attorney. So what he told me wasn't going to be confidential….I mean, if the board asked, I would tell them." *Id*. at 93-94. Nevertheless, Ms. Baldwin did not relate this information to the Board of Trustees. Further, Ms. Baldwin did not advise Curley regarding his Fifth Amendment right against self-incrimination. Ms. Baldwin also did not carefully elucidate the difference between representing Curley in his individual capacity or as an agent of his employer, Penn State.

On the same morning of his scheduled grand jury appearance, agents from the OAG interviewed Curley. Ms. Baldwin was present for that interview. She also attended the OAG interview of Schultz that same day. Following these interviews, but before Curley testified, Ms. Baldwin asked Deputy Attorney General Jonelle Eshbach if Curley and Schultz were targets of the criminal investigation. The prosecutor informed her that they were not targets at that time.[6]

_____

[6] Despite this representation, the OAG was aware that McQueary had told investigators that he reported a sodomy to Schultz and Curley, and it knew that there had not been a follow-up police investigation. Thus, at that time, the OAG presumably had a basis upon which to charge Curley with failure to report suspected child abuse. Hence, the claim was misleading. Moreover, Ms. Baldwin would have been aware that Curley's and Schultz's recollection of what McQueary told them was inconsistent since she was present for their pre-testimony interviews. Specifically, Schultz acknowledged that the behavior that was reported was sexual in nature, but Curley denied that there was any indication of sexual misconduct. The OAG, outside the
*(Footnote Continued Next Page)*

Prior to Curley's testimony, the Grand Jury Supervising Judge, Judge Barry Feudale, queried Ms. Baldwin regarding her representation of Schultz and Curley in chambers in their presence. Specifically, the following exchange occurred:

> OAG: Judge, we're here on Notice 29. We have some witnesses to be sworn, Mr. Curley and Mr. Schultz.
>
> Judge Feudale: Represented by?
>
> Ms. Baldwin: My name is Cynthia Baldwin, general counsel for Pennsylvania State University.
>
> Judge Feudale: Will you be providing representation for both of those identified witnesses?
>
> Ms. Baldwin: Gary is retired but was employed by the university and Tim is still an employee.

Notes of Grand Jury Colloquy, 1/12/11, at 7-8. Ms. Baldwin did not expressly state that she represented Curley solely in an agency capacity, nor did she indicate that she did not represent him in his individual capacity. The OAG did not express concern on the record over a potential conflict of interest based on Ms. Baldwin appearing with both Curley and Schultz. Judge Feudale, without requesting further clarification from Ms. Baldwin,

_(Footnote Continued)_ _____

presence of Ms. Baldwin, later explicitly told the grand jury supervising judge that Schultz's and Curley's testimony was not consistent. N.T., 4/13/11, at 10.

then advised the two men of their rights as grand jury witnesses. In relevant part, he set forth:

> As witnesses before the Grand Jury, you're entitled to certain rights and subject to certain duties which I am now going to explain to you. All of these rights and duties are equally important and it's important that you fully understand each of them.
>
> First, you have the right to the advice and assistance of a lawyer. This means you have the right to the services of a lawyer with whom you may consult concerning all matters pertaining to your appearance before the Grand Jury.
>
> You may confer with your lawyer at any time before, during and after your testimony. You may consult with your lawyer throughout your entire contact with the Grand Jury. Your lawyer may be present with you in the Grand Jury room during the time you're actually testifying and **you may confer with her at that time**.
>
> You also may at any time discuss your testimony with your lawyer and except for cause shown before this Court, you may disclose your testimony to whomever you choose, if you choose.
>
> You also have the right to refuse to answer any question pending a ruling by the Court directing you to respond if you honestly believe there are proper legal grounds for your refusal. In particular, you have the right to refuse to answer any question which you honestly believe may tend to incriminate you.
>
> Should you refuse to answer any question, you may offer a reason for your refusal, but you're not obliged to do so. If you answer some questions or begin to answer any particular question, that does not necessarily mean you must continue to answer your questions or even complete the answers you have started.
>
> Now, any answers you give to any question can and may be used against you either for the purpose of a Grand Jury Presentment, Grand Jury Report or a Criminal Information.

> In other words, if you're uncertain as to whether you may lawfully refuse to answer any question or if any other problem arises during the course of your appearance before the Grand Jury, you may stop the questioning and appear before me, either alone **or in this case with your counsel**, and I will rule on that matter whatever it may be.

*Id*. at 8-10 (emphases added).[7]

Curley entered the courtroom with Ms. Baldwin, who was seated beside him during his testimony. At the outset, a deputy attorney general asked Curley, "You have counsel with you?" N.T., Grand Jury Proceeding, Notice No. 20, 1/12/11, at 3. Curley answered, "Yes, I do." *Id*. The prosecutor then asked, "Would you introduce her, please?" *Id*. Curley responded, "My counsel is Cynthia Baldwin." *Id*. Ms. Baldwin did not indicate at that time that she represented Curley solely in an agency

_____

[7] Judge Feudale, in an opinion addressing motions filed by Curley, seeking quashal of the grand jury presentments, opined in *dicta*, "In hindsight, perhaps I erred in not asking follow up question about the role of corporate counsel Baldwin. I regret and perhaps committed error in not asking any follow up questions but while I am unware of what the response would have been, I fail to discern how such would persuade me at this stage why [the] presentments should be dismissed." Judge Feudale Opinion, 4/9/13, at 11. Ultimately, Judge Feudale ruled that he lacked jurisdiction to consider the motions in question. We agree with Judge Feudale, to the limited extent that he erred in neglecting to properly probe the scope of Ms. Baldwin's representation to ensure that Curley understood whether Ms. Baldwin was acting to protect his interests or the University's.

capacity or that she was not representing him in a personal capacity. The Commonwealth questioned Curley about the 1998 and 2001 incidents.[8]

The Commonwealth initially questioned Curley about the 2001 crime. Curley testified that Paterno contacted him and Schultz and advised them that he needed to meet with them regarding an incident reported to him by graduate assistant football coach Michael McQueary. *Id*. at 4-5. Paterno later met with Curley and Schultz. According to Curley, Paterno informed them that McQueary witnessed Sandusky in the shower area with a child and was uncomfortable with the activity occurring therein. *Id*. at 5. Curley relayed that he and Schultz met with McQueary. *Id*. In Curley's recollection, McQueary related that Sandusky was horsing around in the shower area and that it felt inappropriate. *Id*. at 7. Curley adamantly denied that McQueary informed them that anal intercourse transpired between Sandusky and the child. *Id*.

Curley stated that he reported the matter to University President, Dr. Graham Spanier, and contacted Sandusky. He submitted that he also reported the incident to Dr. Jack Raykovitz, then-executive director of the Second Mile, after consulting with Spanier. *Id*. at 6. Curley further instructed Sandusky to refrain from bringing young people into the athletic

_____

[8] At the time, the Commonwealth referred to the 2001 shower crime as occurring in 2002.

facilities at Penn State. *Id*. at 10-11. He did not inform campus police of the incident and indicated that he did not think that what had been reported to him was a crime. *Id*. at 12. Curley acknowledged that there was no follow up investigation into the 2001 report by McQueary. *Id*. at 13. He also denied having any knowledge of a 1998 report of another shower incident involving Sandusky and a child. *Id*. at 13-14. He maintained that the 1998 matter and subsequent police investigation were not brought to his attention. *Id*. at 15. Later-discovered email documents revealed that Curley was aware of the 1998 incident.

The investigating grand jury recommended that Curley be charged with perjury and failure to report on November 7, 2011. The Commonwealth filed a criminal complaint against Curley.[9] Curley retained new counsel and notified Ms. Baldwin, who had retained her own attorney, via letter that Curley did not waive any claim of attorney-client privilege with respect to communications between Ms. Baldwin and him.

Meanwhile, the OAG, in December of 2011, expressed significant frustration with Ms. Baldwin's failure to comply with its document subpoena request and threatened the University and ostensibly her with possible contempt of court "and any other appropriate measures applicable to

_____

[9] The crimes were held for court and the Commonwealth filed a criminal information on January 19, 2012.

obstruction against the institution and those individuals responsible for these

decisions." Letter from OAG to Ms. Baldwin, 12/19/11, at 10.[10]

_____

[10] Although the University was charged with complying with that subpoena in December 2010, it was not until April 2012 that relevant documents were turned over. Notably, although Ms. Baldwin informed University President, Dr. Graham Spanier, of the subpoena and asked if he, Schultz, and Curley had any documents, she apparently did not follow University protocol in ensuring compliance with that subpoena. A grand jury report observed that an "investigation into whether the University fully complied with the subpoena determined that no effort was made to search the Athletic Department, where Sandusky had been employed for over 30 years, or to search any of the electronically stored data at the University or emails or other documents[.]" Grand Jury Presentment No. 29, at 23. The Grand Jury further concluded,

> Penn State had in place a well-defined historical practice and procedure for responding to subpoenas. Subpoenas that might encompass electronically stored data (such as emails and documents stored on a computer or network drive) would routinely be sent to the specialized unit called the "SOS." These information technology professionals were trained and dedicated to assembling responsive electronically stored date in response to litigation needs or other legal process. None of the SOS professionals were ever shown subpoena 1179, nor were they directed to seek any information requested by subpoena 1179 before the arrests of Sandusky, Schultz and Curley.

*Id*.

Ms. Baldwin did assert in her grand jury testimony that she was dependent on the Athletic Department, the President's office, and Vice President's office to comply with the subpoena. Ms. Baldwin also informed the supervising grand jury judge in April of 2011 that she "had the IT people—I've been pushing the IT people and I believe that we can cull those [documents] out for you, that we can do all of those." N.T., 4/13/11, at 27. However, the grand jury report reveals that, in addition to the SOS unit, other individuals employed in the Penn State information technology

*(Footnote Continued Next Page)*

Subsequently, the Commonwealth and Ms. Baldwin entered into discussions about her testifying before the grand jury regarding the responses of Curley, Schultz, and Spanier pertaining to her document requests related to Sandusky. *See* N.T., Grand Jury Conference, 10/22/12, at 2 ("the Office of Attorney General has been conversing with Cynthia Baldwin's counsel and eventually Cynthia Baldwin in the context of a proffer discussion.").

On June 22, 2012, Ms. Baldwin, through counsel, responded to Curley's invocation of the attorney-client privilege. She asserted that she was counsel for Penn State, that she had acted solely in an agency capacity in representing Curley, and that she did not represent him in an individual capacity before the grand jury. In correspondence, Curley again invoked his attorney-client privilege to Judge Feudale and Ms. Baldwin, and copied the letter to the OAG and counsel for Penn State.

New general counsel for Penn State, Michael Mustokoff, asked Judge Feudale for a conference concerning the privilege issues prior to Ms. Baldwin testifying before the grand jury on October 22, 2012. Mr. Mustokoff agreed that Penn State waived the privilege for itself, but explicitly declined to waive the University's privilege as to communications between Ms. Baldwin and Schultz and Curley. Specifically, Mr. Mustokoff wrote,

*(Footnote Continued)* ———————

department maintained that they were not asked to locate such documents. Grand Jury Presentment No. 29, at 23-24.

> We have waived the University's privilege as to those documents with two critical exceptions:
>
> . . .
> (2) any communications between Justice Baldwin and Messrs. Schultz and Curely. We have previously shared our concerns about the Schultz/Curley communications with you and memorialized them in our October 2, 2012 letter to Judge Feudale.

Letter from Michael Mustokoff to Chief Deputy Attorney General Frank Fina, 10/19/12, at 1.

In preparation for Ms. Baldwin's grand jury appearance, Judge Feudale conducted a conference with Mr. Mustokoff, the OAG, and Ms. Baldwin's attorney on October 22, 2012. Curley's attorney was not permitted to attend. Counsel for Penn State astutely noted that it could not waive any privilege that Curley might have and again declined to waive its privilege as to communications between Ms. Baldwin and Curley. The OAG, via Attorney Frank Fina, submitted at that time that it would not question Ms. Baldwin about matters that could involve potential confidential communications between Curley and Ms. Baldwin. Attorney Fina expressly set forth,

> But at this point, Your Honor, we are willing to put Miss Baldwin in the grand jury without addressing any of the issues related to the testimony of Mr. Schultz and Mr. Curley and conversations she had with them about that testimony and put that—put those matters on hold until we get a Court determination regarding the privilege and we can address that later on.

N.T., Grand Jury Conference, 10/22/15, at 6.[11]  Shortly thereafter, Attorney

Fina declared, "There may well be [privilege] claims down the road by

[counsel for Schultz and Curley], and perhaps even counsel for Graham

Spanier; but that is, you know, the risk that the Commonwealth is ready to

bear because we believe that we are soundly within the [University] waiver."

*Id*. at 11.

> Judge Feudale, relying on the representations of Attorney Fina, stated,
>
> I'm satisfied based on what you placed on the record that [Ms. Baldwin] is clearly able to proceed on testimony with the stipulation that you communicated that you're not going to get into an inquiry as to her representation and what that meant with regard to Mr. Curley, Mr. Schultz, and perhaps, as you said, also Mr. Spanier.

*Id*. at 11-12.[12]

_____

[11]  Pa.R.Prof.Conduct 3.10 precludes a prosecutor from subpoenaing an attorney to appear before a grand jury where the prosecutor is seeking to compel the attorney to provide evidence regarding a person who is or has been represented by the attorney.  The rule reads in its entirety,

> A public prosecutor or other governmental lawyer shall not, without prior judicial approval, subpoena an attorney to appear before a grand jury or other tribunal investigating criminal activity in circumstances where the prosecutor or other governmental lawyer seeks to compel the attorney/witness to provide evidence concerning a person who is or has been represented by the attorney/witness.

Pa.R.Prof.Conduct 3.10.

[12] The Commonwealth did not raise any argument that Ms. Baldwin could testify regarding any privileged communications as a result of the crime-fraud exception to the attorney-client privilege.  *See In re Investigating*
*(Footnote Continued Next Page)*

Despite the foregoing representations by Mr. Fina, a number of the Commonwealth's questions to Ms. Baldwin before the grand jury implicated confidential communications.[13] According to Ms. Baldwin's grand jury testimony, Curley told her prior to his testimony that he did not have any documents relating to the 1998 and 2001 Sandusky matters. The Commonwealth specifically inquired of Ms. Baldwin,

> OAG: Again, staying with Mr. Curley, did he get back to you at any point and tell you whether or not he had evidence or materials that would be responsive to the Subpoena 1179?
>
> Ms. Baldwin: Right. Yes.
>
> OAG: What did he say?
>
> Ms. Baldwin: No, he didn't have any materials.
>
> OAG: **And your conversations with those three gentlemen**: Schultz, Spanier, and Curley, were specific correct? They involved e-mails, paper files, any information—
>
> Ms. Baldwin: Anything that could—any document—documents that they had whether they be electronic or nonelectronic.

*(Footnote Continued)* ————————

***Grand Jury of Philadelphia County***, 593 A.2d 402, 406-407 (Pa. 1991) (crime-fraud exception excludes from protection those communications between an attorney and client that are made for the purpose of committing a crime or fraud).

[13] In light of Attorney Fina's representation to Judge Feudale, and mindful of Pa.R.Prof.Conduct 3.10, we find his subsequent questioning of Ms. Baldwin, absent prior judicial approval on the privilege question, to be highly improper.

> OAG: Is it fair to say they assured you they would go through their e-mails and talk to their staff and find anything that was responsive?
>
> Ms. Baldwin: They said they would check and get back to me.
>
> OAG: So Mr. Curley gets back to you and says there is nothing?
>
> Ms. Baldwin: Correct.

N.T., 10/26/12, at 17-18 (emphasis added). These inquiries related to compliance with the subpoena *duces tecum* and directly incriminated Curley in the commission of the crime of obstruction of justice.

Following Ms. Baldwin's testimony, that same day, in a second presentment, the grand jury recommended additional charges against Curley for obstruction of justice and conspiracy to commit obstruction of justice, conspiracy to commit perjury, and conspiracy to commit EWOC. The Commonwealth filed a criminal complaint on November 1, 2012, alleging that Curley committed the crimes of EWOC, obstruction of justice, and conspiracy to commit obstruction of justice, conspiracy to commit perjury, and conspiracy to commit EWOC. It also consolidated Curley's case with prosecutions against Schultz and Spanier.

Preliminary hearings for Curley, Schultz and Spanier were held on July 29, 2013 and July 30, 2013. Ms. Baldwin did not testify. The magisterial district court determined that a *prima facie* case existed against Curley and the cases proceeded to the court of common pleas. Curley filed pre-trial motions to preclude Ms. Baldwin's testimony due to a breach of the

attorney-client privilege, to quash the grand jury presentment, and to suppress his own grand jury testimony and dismiss those charges that arose out of that testimony based on a lack of adequate counsel.

The court conducted a hearing on December 17, 2013. In support of his pre-trial motions, Curley also sought to call Mr. Fina, Ms. Baldwin, and expert witnesses to testify regarding Ms. Baldwin's deficient representation. The court precluded those witnesses from testifying. After receipt of memoranda from the parties, the court scheduled additional hearings on November 20-21, 2014, to consider testimony regarding the scope of the alleged attorney-client privilege between Ms. Baldwin and Schultz, Curley, and Spanier. The court precluded testimony from all witnesses except Ms. Baldwin and the three defendants. It also prevented Curley and his counsel from being present during the testimony of his co-defendants. Ms. Baldwin, however, was present for the testimony of all three men and testified after each of them.

Thereafter, in an order entered on January 14, 2015, the trial court concluded that Curley was not denied counsel during his grand jury testimony on January 12, 2011, because Ms. Baldwin represented him as an agent of Penn State. It further held that Ms. Baldwin did not represent Curley in an individual capacity and that her subsequent testimony did not violate the attorney-client privilege because there was no privilege. Curley then filed this interlocutory appeal, raising three issues for our review.

I.  Where the Pennsylvania Grand Jury Act guarantees all witnesses the right to assistance of counsel and where appellant did not waive his right to counsel, did the attorney-client privilege personally attach when he was represented by employer's general counsel and subpoenaed to give testimonial evidence before the grand jury?

II.  Whether, in this case, the applicable legal standard to establish the existence of the individual attorney-client privilege is controlled by this Court's opinion in **Commonwealth v. Mrozek**[,657 A.2d 997 (Pa.Super. 1995),] and the grand jury context in which the representation arose?

III.  Whether appellant's counsel violated attorney-client privilege when she testified at the grand jury regarding their private communication without first obtaining his waiver of privilege?

Appellant's brief at 5.

In the companion case of **Commonwealth v. Schultz**, __ A.3d __ (Pa.Super. 2015), decided today, we outlined the basis of our jurisdiction to consider an interlocutory appeal regarding issues pertaining to the attorney-client privilege.  For reasons outlined therein, Appellant's contentions relative to the attorney-client privilege are properly before this Court.[14]

_____

[14]  Unlike the appellant in **Schultz**, Curley does not seek to quash his perjury charge that arose from his grand jury testimony based on a denial of counsel during that testimony.  Curley did originally seek to address that issue by filing with the trial court a motion to certify its order under 42 Pa.C.S. § 702(b), to allow an interlocutory appeal by permission.  The trial court denied that motion.  Curley, subsequent to the filing of this appeal, petitioned this Court for review under Pa.R.A.P. 1311, however, the Court

*(Footnote Continued Next Page)*

In **Schultz**, **supra**, we also set forth the general principles of law governing the attorney-client privilege as follows.

> An issue concerning whether a communication is protected by the attorney-client privilege presents a question of law. **In re Thirty-Third Statewide Investigating Grand Jury**, **supra** at 215. Hence, our standard of review is *de novo* and our scope of review is plenary. **Id**. "Although now embodied in statute, the attorney-client privilege is deeply rooted in the common law. Indeed, it is the most revered of the common law privileges." **Commonwealth v. Chmiel**, 738 A.2d 406, 414 (Pa. 1999) (internal citations omitted). In a criminal matter, "counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa.C.S. § 5916.
>
> This Court has opined, "Where legal advice of any kind is sought from a professional legal adviser in his capacity as such the communications relating to the purpose made in confidence by the client are at this instance permanently protected from disclosure by himself or by the legal adviser except the protection may be waived." **In re Gartley**, 491 A.2d 851, 858 (Pa.Super. 1985) (quoting 8 Wigmore, Evidence §§ 2292 at 554 (McNaughton rev. 1961)). Almost a century ago, our Supreme Court posited,
>
>> the circle of protection is not so narrow as to exclude communications, a professional person may deem unimportant to the controversy, or the briefest and lightest talk the client may choose to indulge with his legal adviser, provided he regards him as such at the moment. To found a distinction on such a ground, would be to measure the safety of the confiding party by the extent of his intelligence and

*(Footnote Continued)* ─────────────

denied that petition without prejudice to Curley to pursue that issue in this appeal. He did not seek relief on that basis. **See** footnote 14, *infra* at 23.

knowledge, and to expose to betrayal these very anxieties which prompt those in difficulty to seek the ear of him in whom they trust, in season and out of season. The general rule is[] that all professional communications are sacred.

*Alexander v. Queen*, 253 Pa. 195, 203 (Pa. 1916).  More recently, our Supreme Court declared,

The purposes and necessities of the relation between a client and his attorney require, in many cases, on the part of the client, the fullest and freest disclosure to the attorney of the client's objects, motives and acts. This disclosure is made in the strictest confidence, relying upon the attorney's honor and fidelity. **To permit the attorney to reveal to others what is so disclosed, would be not only a gross violation of a sacred trust upon his part, but it would utterly destroy and prevent the usefulness and benefits to be derived from professional assistance**. **Based upon considerations of public policy, therefore, the law wisely declares that all confidential communications and disclosures, made by a client to his legal adviser for the purpose of obtaining his professional aid or advice, shall be strictly privileged**; -- that the attorney shall not be permitted, without the consent of his client, -- and much less will he be compelled -- to reveal or disclose communications made to him under such circumstances." 2 Mecham on Agency, 2d Ed., § 2297.

*Commonwealth v. Maguigan*, 511 A.2d 1327, 1333-1334 (Pa. 1986) (emphasis added).  Our Supreme Court has further opined,

Recognizing that its purpose is to create an atmosphere that will encourage confidence and dialogue between attorney  and client, the privilege is founded upon a policy extrinsic to the protection of the fact-finding process. *Estate of Kofsky*, 487 Pa. 473, 409 A.2d 1358 (1979). The intended

beneficiary of this policy is not the individual client so much as the systematic administration of justice which depends on frank and open client-attorney communication. *In re Search Warrant B-21778*, 513 Pa. 429, 521 A.2d 422, 428 (1987); *Estate of Kofsky*, *supra*.

*In re Investigating Grand Jury No. 88-00-3505*, 593 A.2d 402 (Pa. 1991). In addition, "in Pennsylvania, the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice." *Gillard v. AIG Ins. Co.*, 15 A.3d 44, 59 (Pa. 2011).

The attorney-client relationship exists not only in one-on-one situations between an individual and an attorney, but it can also exist in a corporate environment in which general counsel or legal staff is present. "When the client is a corporation, the privilege extends to communications between its attorney and agents or employees authorized to act on the corporation's behalf." *In re Condemnation by City of Philadelphia in 16.2626 Acre Area*, 981 A.2d 391, 396 (Pa.Cmwlth. 2009) (citing *Upjohn Co. v. United States*, 449 U.S. 383 (1981)). In *Upjohn*, the United States Supreme Court analyzed the scope of the attorney-client privilege when the client is a corporation. Although *Upjohn* itself did not involve warnings or a discussion of a lawyer's explanation regarding the scope of his representation, the Supreme Court observed that, under certain situations, information about the extent of the attorney-client relationship between a corporate counsel and an employee might be necessary. As a result of that case, "*Upjohn* warnings" have evolved that specifically inform a corporate employee that corporate counsel represents the corporation and not the individual, and that the corporation possesses the attorney-client privilege. *See* Grace M. Giesel, *Upjohn* Warnings, the Attorney-Client Privilege, and Principles of Lawyer Ethics: Achieving Harmony, 65 U. Miami L. Rev. 109, 110-111 (Fall 2010).

In addition to the traditional attorney-client relationship and the corporate environment, the attorney-client privilege also can exist in the context of co-defendants and their attorney or attorneys. When multiple defendants and their counsel engage

in a common defense, the privilege is not waived by the sharing of confidential information among the parties for the benefit of the joint defense. *See Commonwealth v. Scarfo*, 611 A.2d 242 (Pa.Super. 1992), *superseded by statute on other ground as stated in* **Commonwealth v. Buck**, 709 A.2d 892 (Pa. 1998); *see also* Pa.R.Prof.Conduct 1.6(a).

**Schultz**, slip opinion at 31-35 (footnote omitted).

Curley's initial argument is that Ms. Baldwin "represented Mr. Curley before the grand jury in his individual capacity and her testimony violates his attorney-client privilege." Appellant's brief at 34. He contends that the Pennsylvania Investigating Grand Jury Act ("Grand Jury Act" or "Act") protects a personal right to counsel and is designed to protect witnesses from incriminating themselves. Mr. Curley notes that a corporation cannot invoke the right against self-incrimination.

According to Curley, "[i]f as Ms. Baldwin now claims, she represented Mr. Curley only as an agent, he was denied the right to counsel." *Id*. at 37. In his view, any testimony garnered while Ms. Baldwin only represented him in an agency capacity was "obtained in violation of his right to counsel and privilege against self-incrimination." *Id*.[15] Curley, however, submits that

---

[15] We note that Curley's entire argument on appeal, relative to being denied counsel, consists of the sentences quoted from above. Accordingly, he has not developed on appeal the argument advanced below regarding a constructive denial of counsel during his grand jury testimony. As mentioned in footnote 13, Curley does not seek quashal of the perjury charge arising from that testimony in this appeal based on a lack of adequate counsel.

the grand jury supervising judge did not consider him as a corporate agent. He contends that the record demonstrates that the supervising judge and OAG did not treat him as testifying on behalf of Penn State. Curley highlights that the subpoena in this matter was directed to him personally and not as the University Athletic Director or as a keeper of records.

In addition, Curley asserts that Pa.R.Crim.P. 231 mandates that counsel for the witness is permitted to be present and that Ms. Baldwin's presence in the grand jury room "demonstrated personal representation." *Id*. at 42. He continues that absent an adequate waiver of his personal statutory right to the assistance of counsel, he must have been represented in his individual capacity. Curley avers that the colloquy used by Judge Feudale supports the position that Curley appeared in his personal capacity and was being represented as such by Ms. Baldwin. Lastly, he points out that under Pa.R.Prof.Conduct 1.2, a lawyer seeking to limit the scope of her representation must ensure that the client provides informed consent, which did not occur herein.

In light of our decision in *Schultz*, *supra*, we find that, even assuming Ms. Baldwin represented Curley in an agency capacity, his communications to her regarding being subpoenaed to testify before the criminal investigating grand jury were privileged. In *Schultz*, we opined,

> As our Rules of Professional Conduct illustrate, communications between a putative client and corporate counsel are generally privileged prior to counsel informing the individual

of the distinction between representing the individual as an agent of the corporation and representing the person in his or her personal capacity. *See* Pa.R.Prof.Conduct 1.2(c) (lawyer may limit scope of representation provided the client gives informed consent); Pa.R.Prof.Conduct 1.0(e) (defining "informed consent"); *see also* Pa.R.Prof.Conduct 1.6(a) ("A lawyer shall not reveal information relating to representation of a client unless the client gives informed consent, except for disclosures that are impliedly authorized in order to carry out representation and except as stated in paragraphs (b) and (c)."); *see also* Pa.R.Prof.Conduct 1.18(b) ("Even when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal information which may be significantly harmful to that person").

When corporate counsel clarifies the potential inherent conflict of interest in representing the corporation and an individual and explains that the attorney may divulge the communications between that person and the attorney because they do not represent the individual, the individual may then make a knowing, intelligent, and voluntary decision whether to continue communicating with corporate counsel. This is all the more essential where the purpose of the individual seeking advice relates to an appearance and testimony before a criminal investigating grand jury.

Absent a privilege existing for preliminary communications, the putative client cannot have full and frank discussions with the attorney in order to determine whether it would be appropriate for that lawyer to represent him or her in an individual capacity. *See Chmiel*, *supra* at 422-423 ("The purpose of the privilege is not to further the fact-finding process, but to foster a confidence between attorney and client that will lead to a trusting and open dialogue."); *Upjohn*, *supra* at 389 ("Its purpose is to encourage full and frank communication between attorneys and their clients.").

Furthermore, the attorney might be unable to make a determination as to whether he or she could represent that individual personally if the putative client believes full disclosure will not be kept confidential. *See In re Thirty-Third Statewide Investigating Grand Jury*, *supra* at 216-217 (internal citations and parenthetical omitted) ("The attorney-

client privilege is intended to foster candid communications between counsel and client, so that counsel may provide legal advice based upon the most complete information from the client. The central principle is that a client may be reluctant to disclose to his lawyer all facts necessary to obtain informed legal advice, if the communication may later be exposed to public scrutiny.").

*Schultz*, slip opinion at 57-59.

Instantly, the trial court and Commonwealth have muddled the issue by focusing almost solely on whether Ms. Baldwin represented Curley individually or as an agent. As we outlined in *Schultz*, certain communications between a corporate attorney and an employee of the corporation still may be personally privileged. It simply does not follow that, if Ms. Baldwin represented Curley as an agent of Penn State, none of his communications with her were privileged. Moreover, the corporation must still waive its own privilege in order for communications between its agents and counsel to be disclosed. Here, the record establishes that the University expressly declined to waive its privilege with respect to communications between Ms. Baldwin and Curley. Thus, the trial court erred in finding that Penn State waived its privilege regarding issues concerning Ms. Baldwin's communications with Curley.

With respect to Curley's second issue, and whether application of *Mrozek* is proper and the cases relied on by the trial court are distinguishable, we need not repeat our discussion of those cases that we undertook in *Schultz*. It will suffice that we agree that reliance on *In the*

*Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120 (3d Cir. 1988), *Maleski by Chronister v. Corporate Life Ins. Co.*, 641 A.2d 1 (Pa.Cmwlth 1994), and *United States v. Norris*, 722 F.Supp. 2d 632 (E.D. Pa. 2010), in the context of advice given to an individual preparing to testify before a criminal investigating grand jury was inapt and that, even applying the *Bevill* test,[16] the trial court erred in its legal conclusions.

In the present case, Curley met with Ms. Baldwin to discuss the subpoena served on him to testify before a criminal grand jury investigating Jerry Sandusky. The subpoena was not for the University. This meeting was for the purpose of securing legal advice. The trial court itself found that Curley sought legal advice from Ms. Baldwin related to appearing before the

---

[16]    The test outlined in *In the Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120 (3d Cir. 1988), is as follows:

> First, they must show they approached counsel for the purpose of seeking legal advice. Second, they must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with counsel were confidential. And, fifth, they must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company.

*Bevill*, *supra* at 125.

grand jury investigation into Jerry Sandusky. The issues discussed between Ms. Baldwin and Curley were not general business matters related to the operation of the University, but pertained to the criminal investigation into Jerry Sandusky. Indeed, unlike the cases relied on by the trial court, this case does not involve discussions between corporate counsel and officers of the corporation for purposes of operating and running that business or an internal investigation into the corporation's business practices.

Ms. Baldwin also communicated with Curley and expressed her belief that no conflict existed between her representation of Schultz and Curley. Thus, Ms. Baldwin was apparently aware of the potential for a conflict of interest between Curley and Schultz. Ms. Baldwin did not reveal Curley's communications to the Board of Trustees of Penn State, except perhaps to Spanier, whom she also represented at the very least as an agent of Penn State. Curley has claimed his privilege and Penn State expressly refused to waive any privilege relative to communications between Ms. Baldwin and him. Finally, the communications concerned the rights and responsibilities of Curley relative to appearing before a grand jury and not Penn State's corporate rights.

Moreover, Ms. Baldwin did not adequately explain to Curley that her representation of him was solely as an agent of Penn State and that she did not represent his individual interests. Although Curley was certainly aware that Ms. Baldwin was general counsel for Penn State, this awareness did not

result in Curley knowing that she represented him solely in an agency capacity. Indeed, it is illogical to conclude that Curley was aware of this critical distinction when there is no evidence to suggest that at the relevant time, the OAG and the supervising grand jury judge, experts in the law, were able to distinguish Ms. Baldwin's representation of Curley as being so limited.

Curley's final issue, that Ms. Baldwin violated his attorney-client privilege by testifying at a grand jury hearing regarding communications between him and her, flows from his prior positions. For the reasons already outlined, we agree that Ms. Baldwin's grand jury testimony was improper. Ms. Baldwin was not competent to testify. Accordingly, and in light of our holding and discussion in *Schultz*, we quash the obstruction of justice and related conspiracy charge and find that Ms. Baldwin is precluded from disclosing privileged communications between herself and Curley. *See Schultz*, *supra*.

Order reversed. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/22/2016