2016 PA Super 14

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| GRAHAM B. SPANIER, | |
| Appellant | No. 304 MDA 2015 |

Appeal from the Order Entered January 14, 2015
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0003615-2013

BEFORE:  BOWES, JENKINS, AND PLATT,* JJ.

OPINION BY BOWES, J.:                    **FILED JANUARY 22, 2016**

Graham B. Spanier appeals from the order denying his pre-trial motions to preclude the introduction of testimony of Cynthia Baldwin[1] and quash certain criminal charges against him based on violations of the attorney-client privilege.[2]  We find that Ms. Baldwin breached the attorney-client privilege and was incompetent to testify as to confidential

---

[1]  Ms. Baldwin is a former Justice of the Pennsylvania Supreme Court. Consistent with the parties and trial court below, and to avoid confusion, we have not referred to her as Justice Baldwin since she was not acting in a judicial capacity.

[2] We have jurisdiction over this appeal pursuant to the collateral order doctrine codified at Pa.R.A.P. 313.  **See Commonwealth v. Schultz**, ___ A.3d ___ (Pa.Super. 2015).

[*]  Retired Senior Judge assigned to the Superior Court.

communications between her and Spanier during her grand jury testimony. Accordingly, we reverse the trial court's determination otherwise, and quash the charges of perjury, obstruction of justice, and conspiracy related to those counts.

The Commonwealth has charged Spanier with perjury, failure to report suspected child abuse, obstruction of justice, and conspiracy to commit perjury, conspiracy to commit obstruction of justice, conspiracy to commit endangering the welfare of a child ("EWOC"), and two counts of EWOC.[3] The charges stem from: 1) his treatment of allegations of sexual misconduct against Gerald "Jerry" A. Sandusky, the former defensive coordinator for the Penn State football team and founder of a non-profit charity serving underprivileged youth, the Second Mile; 2) his testimony pertaining to his handling of those matters before an investigating grand jury, and 3) the testimony of Cynthia Baldwin.[4]

Spanier is the former President of the Pennsylvania State University ("Penn State" or "University"). In 2009, the Pennsylvania Office of Attorney General ("OAG") began investigating allegations that Sandusky sexually

---

[3] The Commonwealth filed a single conspiracy count, which included all of the conspiracy crimes mentioned above.

[4] Our recitation of the facts is based on the certified record, including the grand jury presentments, unsealed testimony, and the factual findings of the trial court. Insofar as Appellant's testimony was not credited by the trial court, we have not relied on that version of events.

abused children over an extended period. As part of the investigation, the OAG convened a statewide investigating Grand Jury. During the course of the investigation, the OAG learned of sexual misconduct by Sandusky that occurred while he was on the campus of Penn State in 2001, as well as an incident involving inappropriate behavior with a minor in 1998.

The grand jury investigation revealed the following regarding the 1998 matter. That incident involved an eleven-year-old boy. *See* Thirty-Third Statewide Investigating Grand Jury Sandusky Presentment, 11/4/11, at 18 (hereinafter Sandusky Presentment). Sandusky transported the victim from the victim's home to Penn State. Sandusky Presentment at 18. On the way to the University, Sandusky placed his right hand on the boy's thigh on multiple occasions. *Id*. The pair lifted weights for approximately twenty minutes before playing a game with a tape ball and cups. *Id*. Sandusky then wrestled with the victim, before instructing the boy to shower. *Id*. The youngster attempted to shower away from Sandusky, but Sandusky beckoned him closer and told him that he warmed up a shower for the child. *Id*. at 18-19. Sandusky grabbed the boy from around his waist, lifting him into the air. *Id*. at 19. He also washed the boy's back and bear hugged the child from behind, before rinsing the child's hair. *Id*.

When Sandusky returned the child to the boy's home, the child's mother noticed that his hair was wet and became upset when she discovered that he had showered with Sandusky. *Id*. She reported the matter to

University Police, who initiated an investigation. *Id*. University Police conducted a wiretap on Sandusky, with the permission of the boy's mother, recording two conversations. *Id*. Sandusky admitted to showering naked with the child and at one point stated that he wished he were dead. *Id*. at 20. He later told police that he hugged the child in the shower and admitted that it was wrong. *Id*. No charges were ultimately filed.

The grand jury investigation also revealed that in 2001, former Penn State assistant football coach, Michael McQueary, who had been a quarterback at Penn State, witnessed Sandusky commit a sexual assault against a minor in a locker room shower on the main campus of the University in February of 2001. *Id*. at 6. McQueary, then a graduate assistant, reported this incident to head football coach Joe Paterno the next day, a Saturday. *Id*. at 7. Paterno, in turn, reported the matter to Athletic Director Tim Curley the following day. *Id*. Within two weeks of the shower incident, McQueary met with Curley and Vice President of Finance and Business Gary Schultz.[5] *Id*. McQueary, who testified before the grand jury prior to January 12, 2011, stated that he told the pair that he believed he saw Sandusky having anal sex with a minor boy. *Id*.

In contrast, Curley testified that they were only told of inappropriate conduct and that there was no indication that Sandusky had engaged in anal

---

[5] Schultz was in charge of campus police as part of his position.

sex. Conversely, Schultz testified that he had been present for a meeting with Paterno and Curley regarding the incident as well as a later meeting with only Curley and McQueary. Schultz and Curley apprised Spanier that Sandusky had been observed in the shower of the football building with a child and that the person who witnessed the pair was uncomfortable. Spanier acknowledged that meeting in his own grand jury testimony and testified that he had been told that Sandusky had been witnessed in horseplay in the shower with a child.

Spanier advised Curley and Schultz that "something like that could be misconstrued and probably we wanted to discourage people bringing younger kids into our facilities." N.T., Grand Jury Proceeding, 4/13/11, at 16. Hence, he instructed them to inform Sandusky not to bring children into the locker room and to contact the chair of the Second Mile foundation. No other action was taken.

As part of the criminal investigation into Sandusky, the OAG subpoenaed Schultz, Curley, and Paterno in December 2010. In addition, Ms. Baldwin was served with a subpoena *duces tecum*, Grand Jury Subpoena 1179, for University documents referencing or related to Jerry Sandusky after 1997. Although the University was served with that subpoena in December 2010, it was not until April 2012 that relevant documents were turned over. Although Ms. Baldwin maintained that she informed Spanier of the subpoena and asked if he, Schultz, and Curley had any documents, to

which they responded in the negative, she did not follow University protocol in ensuring compliance with that subpoena.[6]

After Ms. Baldwin alerted Spanier to the University subpoena and informed him of the subpoenas for Curley, Paterno, and Schultz, she agreed that she would represent each of them before the grand jury. Paterno,

---

[6] A grand jury report noted that, "investigation into whether the University fully complied with the subpoena determined that no effort was made to search the Athletic Department, where Sandusky had been employed for over 30 years, or to search any of the electronically stored date at the University or emails or other documents[.]" Grand Jury Presentment No. 29, at 23. The Grand Jury further concluded,

> Penn State had in place a well-defined historical practice and procedure for responding to subpoenas. Subpoenas that might encompass electronically stored data (such as emails and documents stored on a computer or network drive) would routinely be sent to the specialized unit called the "SOS." These information technology professionals were trained and dedicated to assembling responsive electronically stored date in response to litigation needs or other legal process. None of the SOS professional were ever shown subpoena 1179, nor were they directed to seek any information requested by subpoena 1179 before the arrests of Sandusky, Schultz and Curley.

*Id*.

Ms. Baldwin asserted in her grand jury testimony that she was dependent on the Athletic Department, the President's office, and Vice President's office to comply with the subpoena. Ms. Baldwin also informed the supervising grand jury judge in April of 2011 that she "had the IT people—I've been pushing the IT people and I believe that we can cull those [documents] out for you, that we can do all of those." N.T., 4/13/11, at 27. The grand jury report revealed that, in addition to the SOS unit, other individuals employed in the Penn State information technology department maintained that they were not asked to locate such documents. Grand Jury Presentment No. 29, at 23-24.

however, elected to retain his own attorney. Ms. Baldwin met independently with Curley on January 3, 2011, and later met with Schultz on January 5, 2011, to explain the grand jury process. She attended pre-grand jury testimony interviews conducted by the OAG with Curley and Schultz on January 12, 2011. She also was present for the grand jury testimony of both Curley and Schultz on that same date.

Spanier was summoned to testify before the grand jury on April 13, 2011. Before his grand jury testimony, Spanier was interviewed by the OAG in March of 2011. Ms. Baldwin was present for that interview. Prior to Spanier's April testimony, but on the same day of that testimony, Ms. Baldwin objected to the scope of Subpoena 1179 before Judge Barry Feudale, the grand jury supervising judge.

After she left the room, and outside of Spanier's presence, the OAG represented to Judge Feudale that the recollections of Curley and Schultz pertaining to the 2001 incident were inconsistent. The OAG further noted that, based on the testimony of Paterno and McQueary, it believed that the testimony of Curley and Schultz lacked credibility. The OAG also indicated that Spanier, in his interview, had provided a story, similar to Curley's, that he had only been told of nonsexual horseplay. These representations were made in discussions over the scope of Subpoena 1179, which had not yet been complied with by Ms. Baldwin and the University. Hence, it was clear at that point to both Judge Feudale and the OAG that the grand jury was

investigating the actions of high-ranking Penn State officials, including Curley, Schultz, and Spanier.

During this exchange, Judge Feudale referred to Ms. Baldwin as counsel for Spanier, setting forth to Deputy Attorney General Jonelle Eshbach, "It appeared that counsel for Mr. Spanier initially expressed concern about recent disclosures and didn't get specific about that and then indicated that there was a broad amount of materials that were subpoenaed[.]" N.T., Grand Jury Subpoena/Colloquy Proceeding, 4/13/11, at 17. Thereafter, the OAG averred, with respect to Spanier testifying, "We're not going to ask him about anything related to the subpoena. I didn't hear Attorney Baldwin object to his testimony yet." *Id*. at 22. The court then brought Ms. Baldwin back into the room. At one point, Judge Feudale stated to Ms. Baldwin, "I also learned that evidently the testimony of your witness today could proceed without the discussions, especially since you didn't file a written motion to quash and wasn't [sic] very specific with regard to what it is that you felt was inappropriately subpoenaed or whatever concerns you were having with regard to compliance with the subpoena." *Id*. at 23.

Subsequently, after discussions regarding compliance with the Subpoena 1179 were coming to a close, Judge Feudale inquired, "Cindy, [Ms. Baldwin] just for the record, who do you represent?" *Id*. at 28. Outside the presence of Spanier, and for the first time on the record, Ms.

Baldwin responded, "The university." *Id*. Judge Feudale followed up, "The university solely?" Ms. Baldwin answered, "Yes, I represent the university solely." *Id*.

Immediately after this questioning, Spanier was brought into the room. Judge Feudale then colloquied Spanier, with Ms. Baldwin present, as follows.

> [Y]ou have the right to the advice and assistance of a lawyer. This means you have the right to the services of a lawyer with whom you may consult concerning all matters pertaining to your appearance before the Grand Jury.
>
> You may confer with your lawyer at any time before, during and after your testimony. You may consult with your lawyer throughout your entire contact with the Grand Jury. Your lawyer may be present with you in the Grand Jury room during the time you're actually testifying and you may confer with him or with her at that time.
>
> You may at any time discuss your testimony with your lawyer and except for cause shown before the Court, you may disclose your testimony to whomever you choose, if you choose.

*Id*. at 29-30.

Despite Ms. Baldwin's earlier averment that she solely represented the University, Judge Feudale did not colloquy Spanier regarding the scope or type of representation he was being afforded by Ms. Baldwin.[7] Additionally,

---

[7] Judge Feudale, in an opinion addressing motions seeking quashal of the grand jury presentments, filed before him by Spanier, Curley, and Schultz, opined in *dicta*, "In hindsight, perhaps I erred in not asking follow up question about the role of corporate counsel Baldwin. I regret and perhaps

*(Footnote Continued Next Page)*

the OAG did not express concern over Ms. Baldwin being present for Spanier's testimony. Upon entering the grand jury room, the OAG queried, "Sir, you're represented by counsel today?" N.T., 4/13/11, at 3. Spanier responded, "Yes." The OAG then asked, "Could you just identify counsel?" *Id*. Spanier answered, "Cynthia Baldwin sitting behind me." *Id*.[8]

The OAG questioned Spanier extensively about information he received regarding the 1998 and 2001 Sandusky incidents from Curley and Schultz. In addition, it queried Spanier about his involvement in general criminal matters occurring on the Penn State campus. Spanier acknowledged that "There was one time when our athletic director and senior vice president, the two individuals you mentioned earlier came to seek my advice on a matter relating to Jerry Sandusky." N.T., Grand Jury Testimony, 4/13/11, at 12. He continued that,

> They asked if they could come over to my office to see me because the athletic director, Mr. Curley, had been approached by a member of his staff saying that he was somewhat uncomfortable because Jerry Sandusky in the football building locker room area in the shower was with a younger child and that they were horsing around in the shower.

(Footnote Continued) ———————————————

committed error in not asking any follow up questions but while I am unaware of what the response would have been, I fail to discern how such would persuade me at this stage why [the] presentments should be dismissed." Judge Feudale Opinion, 4/9/13, at 11. Ultimately, Judge Feudale ruled that he lacked jurisdiction to consider the motions in question.

[8] We note that supervising grand jury judges are not present in the courtroom during the questioning of grand jury witnesses.

*Id*. at 15. Spanier submitted that they asked for his advice and that he instructed them that they should inform Sandusky to refrain from bringing children under eighteen years of age into the locker room facilities and to contact the board chair of the Second Mile Foundation. When asked about the 1998 police investigation into Sandusky, Spanier denied ever being informed of that investigation, but admitted that he had been copied on emails in 1998 involving that matter. During the course of Spanier's grand jury testimony, Ms. Baldwin did interrupt to consult with him and allow him to clarify certain matters not material herein.

Thereafter, in December of 2011, the OAG expressed significant frustration with Ms. Baldwin's failure to comply with its document subpoena request and threatened the University, and ostensibly her, with possible contempt of court "and any other appropriate measures applicable to obstruction against the institution and those individuals responsible for these decisions." Letter from OAG to Ms. Baldwin, 12/19/11, at 2. Subsequently, the Commonwealth and Ms. Baldwin entered into discussions regarding her testifying before the grand jury about the responses of Curley, Schultz and Spanier pertaining to her document requests related to Sandusky. *See* N.T., Grand Jury Conference, 10/22/12, at 2 ("the Office of Attorney General has been conversing with Cynthia Baldwin's counsel and eventually Cynthia Baldwin in the context of a proffer discussion.").

New general counsel for Penn State, Michael Mustokoff, asked Judge Feudale for a conference concerning privilege matters prior to Ms. Baldwin testifying before the grand jury on October 22, 2012. Mr. Mustokoff agreed that the University would waive its own privilege with respect to Ms. Baldwin, but explicitly declined to waive any privilege that might exist between Ms. Baldwin and Curley and Ms. Baldwin and Schultz. Specifically, Mr. Mustokoff wrote,

> We have waived the University's privilege as to those documents with two critical exceptions:
>
> . . .
> (2) any communications between Justice Baldwin and Messrs. Schultz and Curely. We have previously shared our concerns about the Schultz/Curley communications with you and memorialized them in our October 2, 2012 letter to Judge Feudale.

Letter from Michael Mustokoff to Chief Deputy Attorney General Frank Fina, 10/19/12, at 1.

In preparation for Ms. Baldwin's grand jury appearance, Judge Feudale conducted a conference with Mr. Mustokoff, the OAG, and Ms. Baldwin's attorney on October 22, 2012. Due to the secrecy attendant to grand jury proceedings, Spanier was not aware that Ms. Baldwin was going to testify and could not lodge any objection. New counsel for Curley and Schultz already had provided letters to the OAG, Judge Feudale, and counsel for Ms. Baldwin, invoking the attorney-client privilege.

Counsel for Penn State astutely noted that it could not waive any privilege that Curley and Schultz might have and again declined to waive its privilege as to communications between Ms. Baldwin and Curley and Schultz. The OAG, via Attorney Frank Fina, submitted at that time that it would not question Ms. Baldwin about matters that could involve potential confidential communications between Curley, Schultz, Spanier and Ms. Baldwin. Attorney Fina expressly set forth,

> But at this point, Your Honor, we are willing to put Miss Baldwin in the grand jury without addressing any of the issues related to the testimony of Mr. Schultz and Mr. Curley and conversations she had with them about that testimony and put that—put those matters on hold until we get a Court determination regarding the privilege and we can address that later on.

*Id*. at 6.[9]

_____

[9] Pa.R.Prof.Conduct 3.10 precludes a prosecutor from subpoenaing an attorney to appear before a grand jury where the prosecutor is seeking to compel the attorney to provide evidence regarding a person who is or has been represented by the attorney. The rule reads in its entirety,

> A public prosecutor or other governmental lawyer shall not, without prior judicial approval, subpoena an attorney to appear before a grand jury or other tribunal investigating criminal activity in circumstances where the prosecutor or other governmental lawyer seeks to compel the attorney/witness to provide evidence concerning a person who is or has been represented by the attorney/witness.

Pa.R.Prof.Conduct 3.10.

Shortly thereafter, Mr. Fina submitted, "There may well be [privilege] claims down the road by [counsel for Mr. Schultz and Mr. Curley], and perhaps even counsel for Graham Spanier; but that is, you know, the risk that the Commonwealth is ready to bear because we believe that we are soundly within the [University] waiver." *Id*. at 11.

Judge Feudale, relying on the representations of Mr. Fina, stated,

> I'm satisfied based on what you placed on the record that [Ms. Baldwin] is clearly able to proceed on testimony with the stipulation that you communicated that you're not going to get into an inquiry as to her representation and what that meant with regard to Mr. Curley, Mr. Schultz, and perhaps, as you said, also Mr. Spanier.

*Id*. at 11-12.[10]

Judge Feudale provided the same colloquy regarding the right to counsel to Ms. Baldwin as he did to Curley, Schultz, and Spanier. After entering the courtroom, Ms. Baldwin indicated that she was present with and accompanied by two attorneys. Those attorneys were representing her personally. Despite the foregoing representations by Mr. Fina, a significant

_____

[10] The Commonwealth did not raise any argument that Ms. Baldwin could testify regarding any privileged communications as a result of the crime-fraud exception to the attorney-client privilege. *See In re Investigating Grand Jury of Philadelphia County*, 593 A.2d 402, 406-07 (Pa. 1991) (crime-fraud exception excludes from protection those communications between an attorney and client that are made for the purpose of committing a crime or fraud).

number of the Commonwealth's questions to Ms. Baldwin before the grand jury implicated potential confidential communications.[11]

In response to a question regarding the earlier OAG interview with Spanier, Ms. Baldwin responded,

> Oh, there was an interview with Graham on March 22nd, yes. So that what happened, of course, is the Office of Attorney General contacted me and said that they would like to interview the President and because the President has a busy schedule and I can't commit the President, I had to contact his office and tell them that the Office of Attorney General wanted to meet with him and there were certain dates.
>
> So the date that was agreed upon was March 22nd and on March 22nd, I actually went with the President to meet with the Office of Attorney General in their State College office at which time he was interviewed.

N.T. Grand Jury Testimony, 10/26/12, at 22.

The questioning continued as follows.

> Mr. Fina: Okay. Now, **tell us, if you would, about your discussions with Spanier** before that interview. I'm specifically interested in, you know, what anticipation of questions he would have had going into that interview.
>
> Ms. Baldwin: Okay. Because being interviewed by the Office of Attorney General is serious in itself, I said to him, you know, when they question you, Graham, they are going to talk about things like—they are going to use words like, sodomy and

---

[11] In light of Attorney Fina's representation to Judge Feudale, and mindful of Pa.R.Prof.Conduct 3.10, we find his subsequent questioning of Ms. Baldwin, absent prior judicial approval on the privilege question, to be highly improper.

pedophile because I didn't want him to be shocked by the questioning and the type of questioning.

And you have to, you know—you have to be aware that they are going to use that and you have to tell the truth and you will go in and be interviewed. He said to me, you know, that is fine. I know that. No problem. That was it.

Mr. Fina: Okay. Well, tell us about the context, too, that these questions were likely to arise. In other words, at that point in time, March of 2011, is Graham Spanier fully aware that he is likely to be asked about the 1998 investigation of Sandusky and the 2001 allegations of Mike McQueary?

Ms. Baldwin: He is fully aware of both 1998 and what was then 2002 but, yes. He was very aware of those and there is—there is no doubt because at some point, I became aware of the 1998 and went to get the report.

Mr. Fina: Okay, And let's talk about that. You got the report from the 1998 investigation, I believe, in January of 2011, correct?

Ms. Baldwin: Um hum. That is correct.

Mr. Fina: And that copy of the report that you had, was it copied and given to Spanier or disbursed to Spanier, Schultz, Curley or tell us about that?

Ms. Baldwin: No. It was not disbursed because we had certain considerations because of various laws that there are and because of that, our office got the copy; but it was not disseminated even though Graham was aware that I had gotten a copy of the report.

Mr. Fina: Okay. Did he ever ask to—to read it or come to your office as far as you know and read it?

Ms. Baldwin: No, he did not.

Mr. Fina: **And what was he telling you** about the 1998 investigation?

Ms. Baldwin:  That he didn't know anything.

Mr. Fina:  Now, however, before he comes to the interview, he knows that he is going to be questioned about that?

Ms. Baldwin:  He is aware of that.

Mr. Fina:  Okay.  Now, is he aware of that just from his conversations with you or did he [sic] become aware that he was getting that information from somewhere else as well?

Ms. Baldwin:  He appeared to be getting the information from elsewhere.

Mr. Fina:  Well, tell us, you know, what you came to understand.

Ms. Baldwin:  I came to understand that he was having other discussions with Mr. Curley and Mr. Schultz.

Mr. Fina:  Okay.  That understanding—tell us how clear it was. **Was that what Spanier was telling you**?

Ms. Baldwin:  Correct.

Later, Mr. Fina questioned Ms. Baldwin,

Mr. Fina:  And the testimony of Mr. Spanier is documented, and it is transcribed.  But can you tell us, did he have the same approach to that testimony as he did to the interview.

Ms. Baldwin:  Yes, he did.  I believe that it was only a couple of days later that I was notified that the Office of Attorney General want Graham to appear before the grand jury.

And therefore, I had to, again, go to his administrative assistant and try to set up a time period.  We went back and forth on dates.  We got it all set up and that he was to appear.

But when I went to tell him that they wanted—that they were going to subpoena—that he was going to have to testify before the grand jury, he said, sure, he was looking forward to it.  He has never appeared before a grand jury.  It was, you

know, a new experience for him. It was—it was fine. It was fine.

Mr. Fina: Now, up to this point, tell us how informed you had been keeping the President about everything that you knew of this investigation.

Ms. Baldwin: Well, the running joke in Old Main was that I had my own path up the stairs and across the rug to Graham's office.

Everything that I knew I was passing on to him so that he would be aware of everything that was going on with this particular matter.

Mr. Fina: And when you say by everything, you literally mean everything, right?

Ms. Baldwin: I literally mean everything.

*Id*. at 22-28.

Thereafter, Mr. Fina and Ms. Baldwin had an exchange involving email communications between her and Spanier, regarding his right to disclose his own testimony.

Mr. Fina: Okay. Now, this is interesting. After he sends that e-mail to you and [the Board member], you send him an e-mail directly without [the Board member] on it.

And you say, Graham, those who testify before the grand jury are not held to secrecy and can disclose if they so desire.

If you wish, I can put together something that you can share with the Board from your perspective during a seminar. Cynthia.

Ms. Baldwin: Right.

Mr. Fina: And again, this is entirely consistent with what you have told us that you are telling him that he can tell the Board, he can tell people?

Ms. Baldwin: Right.

*Id*. at 32-33.

Subsequently, Ms. Baldwin related what she disclosed to the Board of

Trustees as follows:

I gave the presentation, talking about the whole grand jury process, talking about what had appeared in the newspaper, talking about, you know, what we knew, not saying anything about the testimony of Curley, Schultz, or Spanier because that was—they could disclose—I can't disclose their testimony and so I told them about all of that.

So all of that was there in 1998, the then—the 2000-what became the 2001 matter, what the grand jury was like, the fact that Mr. Curley and Mr. Schultz and Mr. Paterno had been called to testify, that Mr. Paterno had his own attorney. Yeah, I think that is about it.

*Id*. at 35-36. Following some additional questions and answers, Mr. Fina

again inquired with Ms. Baldwin regarding discussions she had with Spanier:

Mr. Fina: Now, as I understand it, and again, I don't want to mischaracterize anything, **what Spanier has been telling you through this whole period of time** is that he knows nothing about the 1998 investigation of Sandusky, he didn't know anything about it at the time, 1998?

Ms. Baldwin: Correct.

Mr. Fina: And that in 2001, he was told very little about that. **Can you tell us what he specifically was saying to you about those two incidents**?

Ms. Baldwin: What he was saying is basically this: I'm the President of the University. With this situation, it was a situation

- 19 -

I expected my Senior Vice President and Athletic Director to handle. Needless to say, they came to see me. We had a discussion, and I thought they handled it.

Mr. Fina: **Had he ever provided you any details about his involvement in the 2001 situation**?

Ms. Baldwin: I remember that he had talked about they had come to him and they had reached a decision on but what they were going to do and that he—his expectation was that Tim and Gary would take care of it.

Mr. Fina: Well, in addition to that, **did he ever articulate**, you know, what it was that he was told seen in the shower?

Ms. Baldwin: Yeah. Horsing around. Horseplay.

Mr. Fina: And that was—**are those the words or the type of words that he used repeatedly**?

Ms. Baldwin: Those are the words that he used. Horsing around and horseplay.

*Id*. at 39-40.

For much of the remainder of Ms. Baldwin's testimony, she was asked questions about a Spanier press release and a televised interview that he gave to the press. Based on her communications with him, she responded that the majority of information that he supplied was false. She maintained, "That he is—that he is not a person of integrity. He lied to me." *Id*. at 70. She then reiterated, "I can't get inside his mind, but the fact is that there is no doubt that he lied to me. I can't think of any reason, other reason for lying than trying to hide it from me." *Id*.

Following Ms. Baldwin's testimony, that same day, the grand jury recommended charges against Spanier for failure to report suspected child abuse, perjury, obstruction of justice, EWOC, conspiracy to commit obstruction of justice, conspiracy to commit perjury, and conspiracy to commit EWOC. The Commonwealth filed a criminal complaint containing those charges on November 1, 2012, and the grand jury presentment was attached to the complaint as the basis for the charges.

A preliminary hearing against Curley, Schultz and Spanier was held on July 29, 2013 and July 30, 2013. Ms. Baldwin did not testify. The magisterial district court determined that a *prima facie* case existed against Spanier and the case proceeded to the court of common pleas. Spanier filed pre-trial motions to preclude Ms. Baldwin's testimony due to a breach of the attorney-client privilege, to quash the grand jury presentment, and to suppress his own grand jury testimony and dismiss those charges that arose out of that testimony based on the denial of adequate representation by Ms. Baldwin.

The court conducted a pre-trial hearing on December 17, 2013. In support of his pre-trial motions, Spanier sought to call Mr. Fina, Ms. Baldwin, and expert witnesses to testify regarding Ms. Baldwin's deficient representation. The court precluded those witnesses from testifying. After receipt of memoranda from the parties, the court scheduled additional hearings on November 20-21, 2014, to consider testimony regarding the

scope of the alleged attorney-client privilege between Ms. Baldwin and Schultz, Curley, and Spanier. The court prohibited testimony from all witnesses except Ms. Baldwin and the three defendants. It also prevented Spanier and his counsel from being present during the testimony of his co-defendants. Ms. Baldwin, however, was present for the testimony of all three men and testified after each of them.

Thereafter, in an order entered on January 14, 2015, the trial court concluded that Spanier was not denied counsel during his grand jury testimony because Ms. Baldwin represented him as an agent of Penn State. It further held that Ms. Baldwin did not represent Spanier in an individual capacity and that her subsequent testimony did not violate the attorney-client privilege because there was no privilege. Spanier then filed this interlocutory appeal, raising one issue for our review: "whether Ms. Baldwin's testimony violates Dr. Spanier's attorney-client privilege, requiring quashal of the charges that depend on her testimony and preclusion of such testimony in any future proceedings in this case." Appellant's brief at 5.[12]

---

[12] We note that Spanier filed with the trial court a motion to certify its order under 42 Pa.C.S. § 702(b), to allow an interlocutory appeal by permission of other issues pertaining to the attorney-client relationship. The trial court denied that motion. Spanier petitioned this Court for review under Pa.R.A.P. 1311, however, this Court denied that petition.

In the companion case of **Commonwealth v. Schultz**, ___ A.3d ___ (Pa.Super. 2015), we outlined the basis of our jurisdiction to consider an interlocutory appeal with respect to the attorney-client privilege. For reasons outlined therein, this appeal is properly before this Court. In **Schultz**, we also set forth the general principles of law governing the attorney-client privilege as follows.

> An issue concerning whether a communication is protected by the attorney-client privilege presents a question of law. **In re Thirty-Third Statewide Investigating Grand Jury**, **supra** at 215. Hence, our standard of review is de novo and our scope of review is plenary. **Id**. "Although now embodied in statute, the attorney-client privilege is deeply rooted in the common law. Indeed, it is the most revered of the common law privileges." **Commonwealth v. Chmiel**, 738 A.2d 406, 414 (Pa. 1999) (internal citations omitted). In a criminal matter, "counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa.C.S. § 5916.

> This Court has opined, "Where legal advice of any kind is sought from a professional legal adviser in his capacity as such the communications relating to the purpose made in confidence by the client are at this instance permanently protected from disclosure by himself or by the legal adviser except the protection may be waived." **In re Gartley**, 491 A.2d 851, 858 (Pa.Super. 1985) (quoting 8 Wigmore, Evidence §§ 2292 at 554 (McNaughton rev. 1961)). Almost a century ago, our Supreme Court posited,

>> the circle of protection is not so narrow as to exclude communications, a professional person may deem unimportant to the controversy, or the briefest and lightest talk the client may choose to indulge with his legal adviser, provided he regards him as such at the moment. To found a distinction on such a

ground, would be to measure the safety of the confiding party by the extent of his intelligence and knowledge, and to expose to betrayal these very anxieties which prompt those in difficulty to seek the ear of him in whom they trust, in season and out of season. The general rule is, that all professional communications are sacred.

*Alexander v. Queen*, 253 Pa. 195, 203 (Pa. 1916). More recently, our Supreme Court declared,

The purposes and necessities of the relation between a client and his attorney require, in many cases, on the part of the client, the fullest and freest disclosure to the attorney of the client's objects, motives and acts. This disclosure is made in the strictest confidence, relying upon the attorney's honor and fidelity. **To permit the attorney to reveal to others what is so disclosed, would be not only a gross violation of a sacred trust upon his part, but it would utterly destroy and prevent the usefulness and benefits to be derived from professional assistance**. **Based upon considerations of public policy, therefore, the law wisely declares that all confidential communications and disclosures, made by a client to his legal adviser for the purpose of obtaining his professional aid or advice, shall be strictly privileged**; -- that the attorney shall not be permitted, without the consent of his client, -- and much less will he be compelled -- to reveal or disclose communications made to him under such circumstances." 2 Mecham on Agency, 2d Ed., § 2297.

*Commonwealth v. Maguigan*, 511 A.2d 1327, 1333-1334 (Pa. 1986) (emphasis added). Our Supreme Court has further opined,

Recognizing that its purpose is to create an atmosphere that will encourage confidence and dialogue between attorney and client, the privilege is founded upon a policy extrinsic to the protection of

the fact-finding process. ***Estate of Kofsky***, 487 Pa. 473, 409 A.2d 1358 (1979). The intended beneficiary of this policy is not the individual client so much as the systematic administration of justice which depends on frank and open client-attorney communication. ***In re Search Warrant B-21778***, 513 Pa. 429, 521 A.2d 422, 428 (1987); ***Estate of Kofsky***, ***supra***.

***In re Investigating Grand Jury No. 88-00-3505***, 593 A.2d 402 (Pa. 1991). In addition, "in Pennsylvania, the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice." ***Gillard v. AIG Ins. Co.***, 15 A.3d 44, 59 (Pa. 2011).

The attorney-client relationship exists not only in one-on-one situations between an individual and an attorney, but it can also exist in a corporate environment in which general counsel or legal staff is present. "When the client is a corporation, the privilege extends to communications between its attorney and agents or employees authorized to act on the corporation's behalf." ***In re Condemnation by City of Philadelphia in 16.2626 Acre Area***, 981 A.2d 391, 396 (Pa.Cmwlth. 2009) (citing ***Upjohn Co. v. United States***, 449 U.S. 383 (1981)). In ***Upjohn***, the United States Supreme Court analyzed the scope of the attorney-client privilege when the client is a corporation. Although ***Upjohn*** itself did not involve warnings or a discussion of a lawyer's explanation regarding the scope of his representation, the Supreme Court observed that, under certain situations, information about the extent of the attorney-client relationship between a corporate counsel and an employee might be necessary. As a result of that case, "***Upjohn*** warnings" have evolved that specifically inform a corporate employee that corporate counsel represents the corporation and not the individual, and that the corporation possesses the attorney-client privilege. ***See*** Grace M. Giesel, *Upjohn* Warnings, the Attorney-Client Privilege, and Principles of Lawyer Ethics: Achieving Harmony, 65 U. Miami L. Rev. 109, 110-111 (Fall 2010).

In addition to the traditional attorney-client relationship and the corporate environment, the attorney-client privilege also

can exist in the context of co-defendants and their attorney or attorneys. When multiple defendants and their counsel engage in a common defense, the privilege is not waived by the sharing of confidential information among the parties for the benefit of the joint defense. *See Commonwealth v. Scarfo*, 611 A.2d 242 (Pa.Super. 1992), *superseded by statute on other ground as stated in Commonwealth v. Buck*, 709 A.2d 892 (Pa. 1998); *see also* Pa.R.Prof.Conduct 1.6(a).

*Schultz*, slip opinion at 31-35 (footnote omitted).

Spanier begins his argument by maintaining that Ms. Baldwin represented him in his individual capacity when he testified before the grand jury. He submits that Ms. Baldwin was his attorney for both his interview with the OAG and his subsequent grand jury testimony. In his view, the trial court's decision finding that he was adequately represented in his official capacity by Ms. Baldwin's representation of the University is unprecedented.[13]

Spanier continues that Ms. Baldwin may only have limited the scope of her representation if he provided informed consent, which he did not. Since Ms. Baldwin did not ask for or obtain informed consent to limit her representation, Spanier asserts that her representation of him was personal

---

[13] We do note that the Commonwealth has failed to cite a single case where a witness testified before a grand jury in an organizational or representative capacity and the testimony offered was used to prosecute the individual in a personal capacity. In contrast, the United States Supreme Court has held that a witness cannot be made to testify before a grand jury as a representative of an organization because any testimony would be personal. *See Curcio v. United States*, 354 U.S. 118, 123-124 (1957).

representation. He adds that Ms. Baldwin's own belief as to whom she represented is immaterial because the critical inquiry is what the client reasonably believed. Spanier posits that he "reasonably believed that Ms. Baldwin would act as his attorney, not solely as Penn State's attorney." Appellant's brief at 30.

In further support of this view, Spanier notes that grand jury testimony "is an inherently personal undertaking, involving personal rights (like the right against self-incrimination) and personal liability[.]" *Id*. He points out that he was subpoenaed to testify as an individual, identified Ms. Baldwin as his lawyer, and consulted with her during his own testimony. Spanier maintains that testifying in an official capacity versus an individual capacity is "out of place in the context of a witness giving sworn testimony before a grand jury." *Id*. at 31. In this respect, he contends that a grand jury witness's right against self-incrimination is a personal privilege and testifying before a grand jury is inherently personal. *Id*. at 32. Spanier highlights that a custodian of records subpoenaed for documents cannot invoke the right against self-incrimination to avoid disclosing documents. However, he posits that oral testimony is distinct. Continuing, Spanier submits that the grand jury supervising judge advised him of his personal rights and did not explain or provide any instructions relative to testifying in an agency capacity.

Additionally, Spanier argues that the trial court's reliance on *In the Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120 (3d Cir. 1988), *Maleski by Chronister v. Corporate Life Ins. Co.*, 641 A.2d 1 (Pa.Cmwlth 1994), and *United States v. Norris*, 722 F.Supp. 2d 632 (E.D. Pa. 2010), was erroneous.[14]   His arguments are substantially the same as those proffered in *Schultz*, *supra*.  We have previously explained our reasoning for agreeing with this contention in *Schultz*, and need not undertake an additional discourse explaining Spanier's arguments or why those cases are inapplicable.

Spanier also contends that his statutory right to counsel was violated if Ms. Baldwin did not represent him personally.  Indeed, we made a similar finding in *Schultz*.  Spanier avers that "[i]f the Commonwealth were correct

---

[14]   The test outlined in *In the Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120 (3d Cir. 1988), is as follows:

> First, they must show they approached counsel for the purpose of seeking legal advice. Second, they must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with counsel were confidential. And, fifth, they must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company.

*Bevill*, *supra* at 125.

that Ms. Baldwin did not represent Dr. Spanier as an individual, the unavoidable implication would be that Dr. Spanier was denied his right to personal counsel." Appellant's brief at 48. According to Spanier, "[o]n the Commonwealth's own theory, Dr. Spanier was compelled to testify without the protection of counsel, and the charges against him should be quashed." *Id*. at 49 (citing ***Commonwealth v. McCloskey***, 277 A.2d (Pa. 1971); ***Commonwealth v. Cohen***, 289 A.2d 96 (Pa.Super. 1972) (plurality)).[15]

In addition, Spanier asserts that the rules of grand jury secrecy would have been violated if Ms. Baldwin were present in the courtroom during his testimony, but was not representing him in an individual capacity. He maintains that Pa.R.Crim.P. 231(A), governing who can be present during grand jury testimony, allows for "[c]ounsel for the witness under examination as provided by law." For these reasons, Spanier posits that Ms. Baldwin's testimony regarding communications between him and her were privileged and she was not competent to testify as to those communications during her grand jury testimony.

_____

[15] We note that Spanier's position regarding the right to counsel during a grand jury proceeding is offered to demonstrate that Ms. Baldwin represented him in an individual capacity and that an attorney-client privilege existed. Unlike the appellant in ***Schultz***, Spanier does not fully develop the argument that, because of a denial of his statutory right to counsel during his grand jury testimony, the charges should be quashed based on a lack of personal counsel during that testimony. Accordingly, we have not considered whether he is entitled to relief on that basis.

The Commonwealth's initial response in this matter is identical to that proffered in **Schultz** and **Commonwealth v. Curley**, ___ A.3d ___ (Pa.Super. 2015). However, it also adds that Spanier waived any attorney-client privilege that existed at the time Ms. Baldwin testified by revealing these communications in public communications. Specifically, it avers that Spanier's July 23, 2012 public letter to the Penn State Board of Trustees and his later televised interview on ABC Nightline waived his privilege.

Spanier counters that he did not waive his privilege because "statements made outside the context of a judicial proceeding cannot trigger a subject-matter waiver of the privilege over related communications." Spanier's reply brief at 2. He adds that the Commonwealth itself declined to invoke this waiver argument when Ms. Baldwin testified before the grand jury. Spanier notes that Pa.R.Prof.Conduct 3.10 requires prior judicial approval before an attorney can be subpoenaed to testify about a client, and that the Commonwealth, "having failed to request the necessary hearing and create a record on its waiver argument, should not now be permitted to press that argument on appeal." Appellant's reply brief at 20. Phrased differently, Spanier contends that the Commonwealth waived its waiver argument by not advancing it at the earliest stage of the proceedings: when it sought Ms. Baldwin's testimony.

With respect to the merits of the Commonwealth's position, Spanier argues that the broad subject matter waiver doctrine used in federal court

relative to the attorney-client privilege has not been adopted in Pennsylvania. **See Bagwell v. Pa.Dep't of Educ.**, 103 A.3d 409, 419 (Pa.Cmwlth. 2014). Furthermore, his statements were made before he was charged and did not occur during litigation, whereas the cases relied on by the Commonwealth, concerning subject matter waiver of privileged communications, involved discovery disputes during the course of litigation. **See Nationwide Mt. Ins. Co. v. Fleming**, 924 A.2d 1259 (Pa.Super. 2007), *affirmed by equally divided court*, 992 A.2d 65 (Pa. 2010). He continues, "it is settled law in Pennsylvania that an attorney remains subject to her obligations under the attorney-client privilege, notwithstanding any subsequent disclosure by the client of confidential information to third parties." Appellant's reply brief at 22.

We begin our analysis with a discussion of whether Spanier waived his attorney-client privilege and find that he did not. Initially, we note that this is not a case where Spanier made his communications to his attorney in the presence of other individuals. In that situation, the communications would not be privileged. **Loutzenhiser v. Doddo**, 260 A.2d 745, 748 (Pa. 1970) ("A communication between an attorney and his client is not privileged if (1) it takes place in the presence of a third person[.]"). In contrast, if Spanier told his attorney in private X, and also revealed that same fact to a friend, that does not result in waiver of the privilege between the attorney and client. **See Commonwealth v. Ferri**, 599 A.2d 208, 211-212 (Pa.Super.

1991) (disclosure to another person who was wearing a wire, did not waive privilege as to earlier communications with attorney); *see also* *Commonwealth v. Clark*, 500 A.2d 440 (Pa.Super. 1985) (discussing marital-privilege).

Here, at the time Ms. Baldwin testified, Spanier was not challenging the adequacy of her representation nor were the communications in question uttered to Ms. Baldwin in the presence of other individuals. Nor did any disclosure by Spanier occur in the course of litigation. That is, he did not attempt to use the attorney-client privilege as a shield and a sword by selectively disclosing certain information during pending litigation. While Spanier's statements in his press release and in his televised interview could be used against him, they do not remove the attorney-client privilege as to his communications with Ms. Baldwin.

Having determined that the Commonwealth's belated waiver claim is unavailing, we now proceed to consider the merits of Spanier's arguments. In *Schultz*, we found that the right to counsel during a witness's grand jury testimony is personal and is designed to protect the testifying individual from offering incriminating testimony. Specifically, we opined, "the presence of the attorney in the grand jury room would be rendered nugatory if that lawyer is not present for the purpose of protecting the witness against incriminating himself." *Schultz*, slip opinion at 53. We added that grand jury counsel must adequately explain to the client any limitations of his or

her representation at a grand jury proceeding. In the absence of informing the witness of such limitations and obtaining consent, the grand jury witness is deprived of personal counsel.

Consistent with our decision in *Schultz*, we find that Ms. Baldwin did not adequately explain to Spanier that her representation of him was solely as an agent of Penn State and that she did not represent his individual interests. Although Spanier knew Ms. Baldwin was general counsel for Penn State, this knowledge does not *ipso facto* result in Spanier understanding that she represented him solely in an agency capacity before the grand jury. Spanier was not aware that Ms. Baldwin was not appearing with him in order to protect his interests and therefore unable to provide advice concerning whether he should answer potentially incriminating questions or invoke his right against self-incrimination. In line with our holdings in *Schultz* and *Curley*, we conclude that Ms. Baldwin was incompetent to testify at the grand jury hearing as to communications between her and Spanier.

In *Schultz*, we set forth the governing principles relevant to determining the existence of an attorney-client privilege. Therein, we asserted,

> As our Rules of Professional Conduct illustrate, communications between a putative client and corporate counsel are generally privileged prior to counsel informing the individual of the distinction between representing the individual as an agent of the corporation and representing the person in his or her personal capacity. *See* Pa.R.Prof.Conduct 1.2(c) (lawyer may limit scope of representation provided the client gives

informed consent); Pa.R.Prof.Conduct 1.0(e) (defining "informed consent"); **see also** Pa.R.Prof.Conduct 1.6(a) ("A lawyer shall not reveal information relating to representation of a client unless the client gives informed consent, except for disclosures that are impliedly authorized in order to carry out representation and except as stated in paragraphs (b) and (c)."); **see also** Pa.R.Prof.Conduct 1.18(b) ("Even when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal information which may be significantly harmful to that person").

When corporate counsel clarifies the potential inherent conflict of interest in representing the corporation and an individual and explains that the attorney may divulge the communications between that person and the attorney because they do not represent the individual, the individual may then make a knowing, intelligent, and voluntary decision whether to continue communicating with corporate counsel. This is all the more essential where the purpose of the individual seeking advice relates to an appearance and testimony before a criminal investigating grand jury.

Absent a privilege existing for preliminary communications, the putative client cannot have full and frank discussions with the attorney in order to determine whether it would be appropriate for that lawyer to represent him or her in an individual capacity. **See Chmiel**, **supra** at 422-423 ("The purpose of the privilege is not to further the fact-finding process, but to foster a confidence between attorney and client that will lead to a trusting and open dialogue."); **Upjohn**, **supra** at 389 ("Its purpose is to encourage full and frank communication between attorneys and their clients.").

Furthermore, the attorney might be unable to make a determination as to whether he or she could represent that individual personally if the putative client believes full disclosure will not be kept confidential. **See In re Thirty-Third Statewide Investigating Grand Jury**, **supra** at 216-217 (internal citations and parenthetical omitted) ("The attorney-client privilege is intended to foster candid communications between counsel and client, so that counsel may provide legal advice based upon the most complete information from the client. The central principle is that a client

may be reluctant to disclose to his lawyer all facts necessary to obtain informed legal advice, if the communication may later be exposed to public scrutiny.").

*Schultz*, slip opinion at 57-59.

As we discussed in both *Schultz* and *Curley*, communications between a corporate attorney and an employee of a corporation may be personally privileged. It simply does not follow that, if Ms. Baldwin represented Spanier as an agent of Penn State, none of his communications with her were privileged.

Instantly, Spanier met with Ms. Baldwin to discuss subpoenas served on Curley, Schultz, Paterno, the University, and later himself. His meetings with Ms. Baldwin relative to his own subpoena did not pertain to a subpoena for the University. He consulted Ms. Baldwin for the purpose of securing legal advice. The issues discussed between Ms. Baldwin and Spanier were not general business matters related to the operation of the University, but concerned the criminal investigation into Jerry Sandusky and Spanier's own response to learning of certain information in 1998 and 2001. Unlike the cases relied on by the trial court, this matter does not involve discussions between corporate counsel and officers of the corporation for purposes of operating and running that business or an internal investigation into the corporation's business practices.

Ms. Baldwin also communicated with Spanier and expressed her belief that no conflict existed between her joint representation of Schultz, Curley

and him. Thus, Ms. Baldwin was aware of the potential for a conflict of interest. Ms. Baldwin did not reveal Spanier's communications to the Board of Trustees of Penn State. Spanier has claimed his privilege. Finally, the communications in question concerned the rights and responsibilities of Spanier relative to appearing before a grand jury and not Penn State's corporate rights.

For reasons outlined, we agree that an attorney-client relationship existed between Spanier and Ms. Baldwin before and during his grand jury testimony, thereby giving rise to an attorney-client privilege. Ms. Baldwin's grand jury testimony regarding communications with Spanier constituted a violation of the attorney-client privilege, rendering her incompetent to testify. Accordingly, and in light of our holdings in **Schultz** and **Curley**, we quash the challenged charges of perjury, obstruction of justice, and conspiracy to commit those crimes.

Order reversed. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/22/2016

- 36 -